IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

FILED
CHARLOTTE, N.C.

03 NOV 21 AM 10: 04

U.S. DISTRICT COURT
W. DIST. OF N.C.

UNITED STATES OF AMERICA, et al.

　　　　　Plaintiffs,

v.

FIRST DATA CORPORATION

And

CONCORD EFS, INC.,

　　　　　Defendants.

Misc. Case No. 3:03MC143

Case Originally Filed in the
United States District Court for the
District Court for the District of Columbia
Case No. 1:03CV02169 (RMC)

---

## BANK OF AMERICA CORPORATION'S
## MEMORANDUM IN SUPPORT OF MOTION TO QUASH OR MODIFY THIRD PARTY
## SUBPOENA AND FOR PROTECTIVE ORDER

　　　　Bank of America Corporation ("Bank of America"), respondent under a subpoena served upon it by defendant in the underlying action First Data Corporation, hereby files this Memorandum in Support of its Motion to Quash or Modify Third Party Subpoena and for Protective Order.

### Introductory Statement

　　　　Bank of America was served with a third party subpoena on or about November 11, 2003 with a return date of November 21, 2003 (the "Subpoena"). The underlying case in which the subpoena was issued is an antitrust action pending in the United States District Court for the District of Columbia (the "Anti-Trust Action"). The Civil Action Number is 1:03CV02169 (RMC). Defendant First Data Corporation's Subpoena Duces Tecum to Bank of America (the

2196503.03
LIB: CH

"Subpoena") seeks documents which constitute and contain highly confidential trade information of Bank of America. A true and correct copy of the Subpoena is attached as Exhibit A.

Bank of America was served with the Subpoena only ten days prior to the Subpoena's return date and was not paid an appearance fee. Therefore, service of the subpoena was deficient. Nevertheless, and without waiving any objections, Bank of America has begun a detailed, good faith effort to identify responsive documents and has attempted to negotiate with counsel for First Data for appropriate protection from disclosure. Bank of America employees and attorneys have spent over 178 hours attempting to respond to the Subpoena in a timely fashion. Bank of America is producing responsive documents which it does not consider to be in need of protection beyond the scope of the protective order in place in the Anti-Trust Action, but objects to the time frame in which a response is required by the Subpoena as overly burdensome. Having just received the Subpoena, Bank of America is not in a position to set forth in detail its objections to each of the individual document requests in the Subpoena, but has stated the nature of its objections to counsel for First Data in a letter setting forth its written objections and makes a good faith effort to describe its objections in this Memorandum.

Many of the potentially responsive documents that Bank of America has been able to identify in this short time frame contain highly confidential trade secrets and competitive strategies of Bank of America for the debit card market and other payment systems markets, the disclosure of which would injure Bank of America. Many of the documents that are sought are in no way relevant or likely to lead to the discovery of information that is relevant to the pending action. Furthermore, the disclosure of the business information in those documents to the parties and retained experts in the underlying lawsuit, who are Bank of America's competitors in the debit card market, will severely prejudice Bank of America because the documents contain

2

highly sensitive commercial information that could be used to the competitive disadvantage of Bank of America. While First Data Corporation ("First Data") has proposed a confidentiality agreement and order concerning the documents requested by the Subpoena, the proposed confidentiality order is inadequate to protect Bank of America. The Protective Order itself provides that "Any protected person requiring further confidentiality protection than is provided by this Order may petition the Court for a separate order governing disclosure of its confidential material." *See* Protective Order, attached as Exhibit B, ¶ 22.

I.      Nature of the Anti-Trust Case

On October 23, 2003, Plaintiffs filed a complaint in the United States District Court for the District of Columbia alleging violations of the Clayton Act and seeking to enjoin the proposed merger of First Data and Concord EFS, Inc. ("Concord") (herein the "Anti-Trust Action"). A copy of the Complaint is attached as Exhibit C. Plaintiffs are the United States of America, acting through the Attorney General and the United States Department of Justice, Antitrust Division, and several states acting through their attorneys general.

Plaintiffs define the relevant product market as "the provision of PIN network debit network services." Verified Complt., ¶ 25. Plaintiffs allege that the merger of First Data and Concord "would likely substantially lessen competition in the provision of PIN debit network services, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18." Verified Complt. ¶ 45, attached hereto as Exhibit C. PIN debit network services "enable consumers to purchase goods and services from merchants." *Id.* at ¶ 1. According to the Complaint, First Data owns sixty-four percent of NYCE Corporation, which operates the NYCE PIN debit and ATM network. The NYCE network is the third-largest PIN network in the country. The Star PIN network, owned by Concord, is the largest such network in the country.

3

2196503.03
LIB: CH

Plaintiffs' complaint identifies PIN debit "as a form of payment" used in retail purchases. *Id.* ¶¶ 1-2, 4-5, 11, 14, 16-17, 19-24, 26-27, 29, 31-36, 38-41, and 45. PIN debit network services is (i) a switching service connecting "financial institutions with merchants" allowing "consumers to access the money in their checking accounts" and (ii) "related functions necessary for the efficient operation of the network," including the promotion of "their brand name among consumers, merchants and banks;" the setting of "rules and standards to govern their networks;" and the setting of "fees and assessments for use of the network's products and services." *Id.* at ¶ 16. PIN debit is a "method of payment for consumers to purchase goods and services at retail stores." *Id.* at ¶ 14.

Defendants filed answers to the Verified Complaint. Defendants' Answers do not dispute Plaintiffs' definition of the PIN debit transfers market. Defendants argue that the relevant market for determining whether or not the Clayton Act has been violated is not merely the PIN debit transfers market but includes "at a minimum all other payment methods capable of accessing customers' [deposit] accounts." FDC Answer, ¶ 1. A copy of the FDC Answer is attached hereto as Exhibit D. This case is on a fast track for trial. Bank of America understands that there is a scheduling order in place tentatively setting the case for a bench trial beginning December 15, 2003.

II.      First Data's Subpoena to Bank of America

On November 10, 2003, First Data issued the Subpoena from this Court. The Subpoena required a representative of Bank of America to appear for a deposition on November 21, 2003 in Charlotte, and that the deponent produce certain documents. Evidently recognizing that some of the requests in the Subpoena sought confidential trade information, First Data served along with the subpoena a copy of the confidentiality stipulation and order already in place in the Anti-

4

Trust Action along with its Subpoena. A true and correct copy of the Joint Motion for Entry of Proposed Protective Order filed in the Antitrust Case is attached as Exhibit B. That order is insuffienet to protect Bank of America, and Bank of America seeks the entry of an order by this Court that protects it from disclosure of information as detailed herein.

Bank of America's agent for service of process received the Subpoena on November 11, 2003 in Raleigh. Service was deficient in that an appearance fee was not included with the Subpoena. The Subpoena was thereafter delivered to Bank of America's legal department on Friday, November 14. Since then, Bank of America has worked diligently to respond to the Subpoena. Employees, officers and attorneys for Bank of America have spent over 178 hours in searching for documents and attempting to respond to the Subpoena in the last week. Bank of America has initiated several telephone conversations with First Data concerning the scope of the Subpoena, particularly concerning the extremely sensitive trade information that was being sought. Bank of America and First Data have as of the filing of this Motion been unable to reach a compromise on the disputed items, so written objections to the Subpoena were served upon counsel issuing the Subpoena on November 20, 2003, attached hereto as Exhibit E.

III.     The information sought is not relevant to this action, and any relevance is outweighed by prejudice to Bank of America.

Bank of America is a national banking association that provides payment services in many different forms both to its customers and to merchants nationwide. Specifically, it provides customers with the ability to access the funds in their demand checking accounts on demand through debit card transactions at many different retail outlets. Bank of America participates in PIN networks, although it does not administer its own network. As stated in the complaint, PIN networks compete for merchants to accept and route purchases over their networks. The proposed transaction between defendants raises potential concerns for Bank of

5

2196503.03
LJB: CH

America because Bank of America is a customer and competitor of Defendants in some lines of their businesses.

Bank of America is a leader in the payments industry, including the PIN debit payment process. Bank of America is the number one issuer of PIN and signature debit cards. Bank of America is the number one receiver of ACH transactions. The ACH system is a nationwide electronic fund transfer (EFT) system that provides for the inter-bank clearing of credit and debit transactions and for the exchange of information among participating financial institutions. Bank of America is the number 5 originator of ACH transactions and is also the fifth largest issuer of credit cards in the country. Other than of the Federal Reserve System, Bank of America is the largest check processor in the country.

Bank of America vigorously objects to the disclosure of other highly sensitive and confidential documents that have no apparent relevance in this action, and that would not be adequately protected even under the terms of the protective order in place in these proceedings. While Bank of America has not been given adequate time to examine all of the grounds upon which discovery of the requested documents should be denied, some of the requests directly seek information concerning Bank of America's customers, revenues, volume of business and marketing efforts. This is information that Bank of America should not be required to provide to competitors, competitors attorneys or competitors experts. In fact, Bank of America should not be required to disclose this information to anyone in civil litigation.

Some of the documents First Data seeks contain information not known to others outside of, or within, the payment processing marketplace. These are internal and external marketplace surveys and studies commissioned and performed by Bank of America for the purposes of their own marketing and strategy decisions, and were never intended for circulation outside of Bank

2196503.03
LIB: CH

of America. These reports and studies are not permitted to be circulated outside of Bank of America. When Bank of America commissions third parties outside of the bank to conduct market research for it, or to compile research concerning Bank of America's own operations, those studies would obviously have been seen by the members of the third party organizations preparing the reports. Those third parties, however, are instructed to treat the information they compile with the utmost discretion and not to circulate the information beyond Bank of America. Finally, this trade information is extremely valuable to Bank of America, given the time and expense incurred to keep track of and compile the information.

The strategies discussed in the documents requested are often breakthrough and some may be considered controversial in the industry. Bank of America has identified a number of product changes and enhancements and new product ideas that will likely only succeed if Bank of America is the first in the industry to introduce those ideas. Bank of America contends that its market position and the analysis that is embodied in the requested documents creates a unique opportunity for it in the marketplace. The defendants in the Anti-Trust Action are competitors to Bank of America's payments businesses. If the proposed combination is permitted to move forward, the new entity will be an even more formidable competitor. If Bank of America is required to produce the requested information anyone who obtains this information will have gained an extraordinarily unfair business advantage. The experts hired by those entities will have obtained Bank of America's cost and pricing models. Although hard to quantify, the use of that information would be detrimental to Bank of America's core business.

In the past few years, Bank of America has initiated a program which it has labeled the "Payments Leadership Council" the purpose of which is to bring together a cross-enterprise team of payments stakeholders who had the vision to devote time, money, and resources to study

2196503.03
LIB: CH

Case 3:03-mc-00143-GCM    Document 2    Filed 11/21/03    Page 7 of 113

the payment industry. Bank of America has spent millions of dollars hiring and contracting the right people, gathering data, and building payments modeling tools to develop executable strategies around payments - for the bank and in the industry. The studies and reports that have been generated by the Payments Leadership Counsel have given Bank of America a significant competitive edge. Those documents should not be produced.

Some of First Data's requests addressing the current state of the PIN debit network services market, or the payment network market in general, appear to be relevant to the subject matter of the case. Bank of America's past and current studies, and future plans, concerning the PIN debit network market or any other payment transaction markets, however, are trade secrets. These studies and reports are the result of years of effort and expense by Bank of America and its agents, and they are protected internally. As such they are proprietary information. Disclosure of these reports and "high level" strategy documents would be extremely harmful to Bank of America and would add nothing to the resolution of the central questions of this case. No matter whether such documents are designated "CONFIDENTIAL" or "BUSINESS SENSITIVE," they will not be adequately protected if the Defendants in this case are permitted to review them, because the Defendants themselves are Bank of America's competition in some areas, and they provide services to Bank of America's competitors in other areas. Defendants and their customers should not be permitted to reap the benefits associated with obtaining Bank of America's market studies merely because a lawsuit has arisen over the propriety of their merger.

Once objections are made, the burden of enforcing the subpoena shifts to the party issuing the subpoena: "If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court

2196503.03
LIB: CH

by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production..." The party serving the subpoena must make a showing of "good cause," that is that the requested documents are necessary to establish its claim or defense, or that denial of production will unduly prejudice preparation of its case or will cause hardship or injustice. *U.S. v. American Optical Co.*, 39 F.R.D. 580, 583 (N.D. Cal. 1966).

The production of the requested documents is not warranted and should be precluded by an order of the court, because the documents contain highly confidential commercial information subject to the protection of Fed.R.Civ.P. 45(c)(3)(B)(i). Parties requesting confidential information from a non-party to the case, even when there is a protective order in place, must demonstrate a strong need for such documents, particularly when they have marginal relevance. *See Litton Indus. v. Chesapeake & Ohio RY.*, 129 F.R.D. 528, 531 (E.D. Wis. 1990) ("there is a constant danger inherent in disclosure of confidential information pursuant to a protective order. Therefore, the party requesting disclosure must make a strong showing of need, especially when confidential information from a non-party is sought.") *Echostar Communications Corp. v. The News Corp. Ltd.*, 180 F.R.D. 391, 396 (D.Colo. 1998) (the existence of a protective order does not justify the production of marginally relevant information from a non-party, particularly where undue hardship is not shown by the party seeking discovery).

The relevance of the requested information which Bank of America objects to producing is not apparent, nor can First Data demonstrate that its need for such documents clearly outweighs the potential harm to Bank of America given the marginal relevance of the information contained therein. *Pulsecard v. Discover Card Services*, 1995 WL 526533, *8

2196503.03
LIB: CH

(D.Kan. Aug. 31, 1995) ("when relevancy is not apparent ... it is the burden of the party seeking discovery to show the relevance of the discovery request").

Bank of America has made an extraordinary effort to respond to the Subpoena, and believes that its efforts have more than satisfied its obligations under the Federal Rules. Since the Subpoena was served, Bank of America has mobilized a team of in house lawyers, and surveyed all of the major segments of its payments business. In addition, it has hired the undersigned counsel to manage the production of documents. Bank of America estimates, conservatively, that it has spent over 178 person hours in searching for documents and preparing a response to the Subpoena. It should be clear that Bank of America is not trying to shirk its responsibilities. Rather, it has genuine and significant business and practical reasons for seeking the protection of this Court. Bank of America requests an opportunity to supplement this objection at an appropriate time. Due to the short amount of time that it has had to response and to gather the requested documents, Bank of America has chosen to focus on producing documents. It should be permitted to supplement this objection if necessary.

Bank of America emphasizes that it is continuing to work with counsel for the defendants in an effort to narrow the scope of these disputes. Based on efforts to date, Bank of America is hopeful that those negotiations with result in an agreement so that Court intervention is not necessary. Due to the extremely short time given for responding to the subpoena, however, Bank of America was forced to file a motion for protective order on November 21. 2003. Bank of America intends to continue to work with the defendants, and if it is unable to reach an agreement regarding confidentiality that is satisfactory, it will supplement this Memorandum with a discussion of each request to which it continues to object and an explanation of why the documents that are requested should not be produced.

2196503.03
LIB: CH

WHEREFORE, Bank of America Corporation requests that this Court issue an Order quashing or modifying the subpoena or a protective order, and for such other and further relief to which Bank of America might be entitled.

This the 21st day of November, 2003.

John H. Culver III
Marie G. Cox
Hearst Tower, 47th Floor
214 North Tryon Street
Charlotte, NC 28202
Telephone: (704) 331-7400
**Attorneys for Bank of America Corporation**

OF COUNSEL:

KENNEDY COVINGTON LOBDELL & HICKMAN, L.L.P.
Hearst Tower, 47th Floor
214 North Tryon Street
Charlotte, NC 28202
Telephone: (704) 331-7400
Firm Facsimile: (704) 331-7598

2196503.03
LIB: CH

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing **Bank of America's Memorandum in Support of Motion to Quash or Modify Third Party Subpoena and for Protective Order** was served upon all other parties to this action by depositing a copy of the same in the United States mail, first-class postage prepaid, addressed as follows:

FOR PLAINTIFFS
UNITED STATES OF AMERICA, STATE OF CONNECTICUT, STATE OF ILLINOIS, STATE OF LOUISIANA, COMMONWEALTH OF MASSACHUSETTS, STATE OF NEW YORK, STATE OF OHIO, STATE OF TEXAS, and DISTRICT OF COLUMBIA

| | |
|---|---|
| **Craig W. Conrath** | **Bennett C. Rushkoff** |
| DEPARTMENT OF JUSTICE | **Charlotte Wartman Parker** |
| 325 Seventh Street, NW | OFFICE OF THE CORPORATION |
| Suite 500 | COUNSEL |
| Washington, DC 20530 | 441 4th Street, NW |
| | Suite 450-N |
| | Washington, DC 20001 |

FOR DEFENDANT FIRST DATA CORPORATION:

| | |
|---|---|
| **Jeffrey T. Green** | **Christopher Burch Hockett** |
| SIDLEY AUSTIN BROWN & WOOD | **David Herschel Fallek** |
| 1501 K Street, NW | **Frank McGowan Hinman** |
| Washington, DC 20005 | **Holly A. House** |
| | **Robert A. Lewis** |
| **Geraldine M. Alexis** | BINGHAM MCCUTCHEN LLP |
| SIDLEY & AUSTIN | Three Embarcadero Center |
| 10 South Dearborn Street | San Francisco, CA 94111 |
| Chicago, IL 60603 | |
| | **Gerard P. Finn** |
| **Victoria Lippincott** | BINGHAM MCCUTCHEN |
| COLLIER SHANNON SCOTT PLLC | 1120 20th Street, NW |
| Washington, DC 20036 | Suite 800 |
| 3050 K Street NW Ste. 4000 | Washington DC 20007-5108 |
| **Served Via Facsimile (202) 342-8451** | |
| **And Regular Mail** | |

2196503.03
LIB: CH

FOR DEFENDANT CONCORD EFS, INC.:

**Mark L. Kovner**
KIRKLAND & ELLIS LLP
655 15th Street, N.W.
Washington, DC  20005

**James Mutchnik**
**Stephen R. Patton**
**Catherine Fazio**
KIRKLAND & ELLIS LLP
AON Building
200 East Randolph Drive
Chicago, IL  60601-6636

This 21st day of November, 2003.

John H. Culver

2196503.03
LIB: CH

Case 3:03-mc-00143-GCM   Document 2   Filed 11/21/03   Page 13 of 113

*145795*


# CT System

**Service of Process Transmittal Form**
Raleigh, North Carolina

11/11/2003

*LEGAL DEPARTMENT* Via Federal Express (2nd Day)
*RECEIVED*

*NOV 13 2003*

*S.F. HEADQUARTERS
BANK OF AMERICA, N.A.*

TO:  Gregory Spencer General Counsel
     Bank of America
     CA5-705-08-01
     555 California Street
     8th Floor
     San Francisco, CA  94104

     Phone: (415) 622-6041 ex:
     FAX: (415) 953-1334

RE:  **PROCESS SERVED IN NORTH CAROLINA**

FOR  Bank of America Corporation Domestic State: De

ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:

| | |
|---|---|
| 1. TITLE OF ACTION: | United States of America, et al, Pltf. vs First Data Corporation and Concord-EFS, Inc., Defts // To: Bank of America Corporation |
| 2. DOCUMENT(S) SERVED: | Subpoena, Attachments, Jointly Proposed Protective Order, Agreement Concerning Confidentiality |
| 3. COURT: | US District Court for the Western District of NC Case Number 1:03CV2169 |
| 4. NATURE OF ACTION: | Subpoena to Produce for the Court |
| 5. ON WHOM PROCESS WAS SERVED: | CT Corporation System, Raleigh, North Carolina |
| 6. DATE AND HOUR OF SERVICE: | By Process server on 11/11/2003 at 11:30 |
| 7. APPEARANCE OR ANSWER DUE: | November 21, 2003 |
| 8. ATTORNEY(S): | Victoria Lippincott Collier Shannon Scott PLLC 3050 K Street NW Ste 400 Washington, DC  20007-5108 |
| 9. REMARKS: | |

CC:  Andrew M Bott
     Bank of America
     CA5-705-08-01
     555 California Street
     8th Floor
     San Francisco, CA  94104

## EXHIBIT
A

Information contained on this transmittal form is recorded for C T Corporation System's record keeping purposes only and to permit quick reference for the recipient. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information that can be obtained from the documents themselves. The recipient is responsible for interpreting the documents and for taking the appropriate action.



CT System

**Service of Process Transmittal Form**
**Raleigh, North Carolina**

11/11/2003

Phone: (415) 622-6106 ex:
FAX: (415) 953-1334
EMAIL: ANDREW.M.BOTT@BANKOFAMERICA.COM

| | |
|---|---|
| SIGNED | CT Corporation System |
| PER | Ron M. Strickland /MR |
| ADDRESS | 225 Hillsborough Street |
| | Raleigh, NC 27603 |
| | SOP WS 0005844101 |

Information contained on this transmittal form is recorded for C T Corporation System's record keeping purposes only and to permit quick reference for the recipient. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information that can be obtained from the documents themselves. The recipient is responsible for interpreting the documents and for taking the appropriate action.

AO 88 (Rev. 11/94) Subpoena in a Civil Case

Issued by the

# UNITED STATES DISTRICT COURT

__Western__ DISTRICT OF __North Carolina__

United States of America, *et. al.*

v.

First Data Corporation and Concord EPS, Inc.

**SUBPOENA IN A CIVIL CASE**

Case Number¹ MISC. (No 1:03CV02169 pending in U.S. Dist. Court for the Dist. of Columbia)

TO. Bank of America Corporation
Bank of America Corporate Center, 100 N. Tryon Street
Charlotte, NC 28255

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):
See Attachment A

| PLACE | DATE AND TIME |
|---|---|
| Reynolds Professional Service, Inc. (Attn: Ruth Reynolds) 725 East Trade Street, Suite 215 Charlotte, NC 28202 | November 28, 2003; 10:00 a.m. |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| Attorney for Defendant First Data Corporation | 11-10-03 November 10, 2003 |

ISSUING OFFICER'S NAME, ADDRESS AND TELEPHONE NUMBER
Victoria Lippincott (202) 342-8400
Collier Shannon Scott PLLC; 3050 K Street NW, Suite 400; Washington D.C. 20007-5108

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on reverse)

¹ If action is pending in district other than district of issuance, state district under case number.

5844018

AO 88 (Rev. 11/91) Subpoena in a Civil Case

---

## PROOF OF SERVICE

|  | DATE | PLACE |
|---|---|---|
| SERVED |  |  |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

---

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

---

**Rule 45, Federal Rules of Civil Procedure, Parts C & D:**

**(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.**

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to

the provisions of clause (c) (3) (B) (iii) of this rule, such a person, may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or the demanded par y to contest that claim.

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

**(d) DUTIES IN RESPONDING TO SUBPOENA.**

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## ATTACHMENT A

Pursuant to Rules 34 and 45 of the Federal Rules of Civil Procedure, defendant First Data Corporation requests that Bank of America Corporation identify, produce, and permit the inspection and copying of the items described below.

### DEFINITIONS

1.    The term "document" is to be construed in its broadest possible sense under Fed. R. Civ. P. 34(a) and includes, but is not limited to, the original and any non-identical copies, any written, typed, punched, encoded, printed, recorded, magnetic, graphic or photographic materials, however produced or reproduced, any mechanical recording of any oral materia. or any sound or visual reproduction, or any other descriptive materials or any retrievable data or information, however stored, recorded or coded. This definition encompasses documents in electronic form, including e-mail and other electronic documents, files, and databases.

2.    The term "relating to" means concerning, referring to, identifying, describing, pertaining to, considering, underlying, modifying, amending, confirming, mentioning, endorsing, evidencing, representing, supporting, qualifying, terminating, revoking, cancelling, or negating.

3.    The time period covered by this Subpoena for Production and Inspection of Documents is from January 1, 2002 up to and including the date of your response, except as o herwise specified.

4.    The term "you" means Bank of America, and its parents, subsidiaries, affiliates, officers, directors, employees, agents, or any others acting on its behalf.

5.    The term "financial institution" means any person or entity that issues ATM, debit or credit cards.

6.    The term "high-level documents" means summaries, reports, studies, presentations, analyses, agendas, meeting minutes, and other documents of that nature prepared by or for your management, and excludes transactional data.

7.    The term "interchange fee" means the fee collected by the issuing bank and paid by a merchant or merchant processor in connection with a POS debit card transaction.

8.    The term "issuer" means any person or entity that issues PIN debit cards or signature debit cards.

9.    The term "merger" refers to the proposed merger between First Data Corp. and Concord EFS, Inc.

10.   The term "merchant" means any person or entity that sells goods or services to retail consumers.

SF:31557V61.2.2U23550-0000500737

11.    The term "network services" means any telecommunications network, system or electronic switch that connects financial institutions, merchants, merchant processors, merchant acquirers and other data processing companies, that enables the authorization, clearing and settlement of POS signature debit card transactions or POS PIN debit card transactions.

12.    The term "on-us" refers to PIN debit POS transactions processed without the use of a shared system switch by a financial institution that both issues cards and either processes transactions for merchants, or has a direct connection to a merchant processor or to a merchant.

13.    The term "PIN" means personal identification number.

14.    The term "PIN debit card" means a debit card used to execute POS PIN debit card transactions.

15.    The term "PIN debit network" means any telecommunications network, system or electronic switch that connects financial institutions, merchants, merchant processors, merchant acquirers and other data processing companies, that enables the authorization, clearing and settlement of POS PIN debit card transactions.

16.    The term "POS" means point of sale.

17.    The term "POS PIN debit card transaction" means an electronic payment made at a retail location, through the use of a PIN debit card and the entering of the cardholder's PIN.

18.    The term "POS signature debit card transaction" means an electronic payment made at a retail location, through the use of a signature debit card (e.g., VISA Check or MasterMoney) and the cardholder's authorizing signature.

19.    The term "processor" means any person or entity that provides any or all of the following services: authorization, data capture, settlement, risk management, transaction data record-keeping and reporting, and/or merchant support.

20.    The term "signature debit card" means a debit card used to execute POS signature debit card transactions.

21.    The term "switch fee" means the fee paid to you by a merchant, merchant processor or issuer in connection with a POS PIN debit card transaction.

22.    The term "network services" means any telecommunications network, system or electronic switch that connects financial institutions, merchants, merchant processors, merchant acquirers and other data processing companies, that enables execution of POS signature debit card transactions or POS PIN debit card transactions.

23.    The term "Wal*Mart litigation" means the class action lawsuit filed by Wal*Mart and other merchants (In re VISA Check/MasterMoney Antitrust Litigation, Master File No. 96-CV-5238 (JG) (E.D.N.Y.)) challenging certain practices by Visa and MasterCard, which was settled earlier this year.

ST-21532962.2/1321550-0000300737

Case 3:03-mc-00143-GCM   Document 2   Filed 11/21/03   Page 19 of 113

24.    Each of the following requests may be fulfilled through a search and production of the files of the five persons you certify in good faith are most likely to have documents responsive to each request (as well as their secretaries or administrative assistants as applicable), provided that the names and titles of the persons whose files were searched are provided for each request.

25.    Documents produced pursuant to subpoena may be designated "CONFIDENTIAL" or "BUSINESS SENSITIVE" pursuant to the Protective Order issued by the Court in *United States et al. v. First Data Corp. and Concord EFS, Inc.,* D.C. No. 03-2169 (RMC), a copy of which is provided with this subpoena.

26.    First Data has attempted to tailor these requests narrowly to minimize the burdens associated with producing the requested documents. Please contact counsel identified on the accompanying subpoena to discuss requested modifications.

## SUBPOENA REQUESTS

### SUBPOENA REQUEST FOR PRODUCTION NO. 1:

All high-level documents relating to any actual, potential or possible efforts or plans by you or by merchants to encourage, discourage, influence or promote the use of POS PIN debit card transactions or POS signature debit card transactions by cardholders (including fees imposed, efforts to inform customers of signature debit benefits, rewards programs, promotions, BIN management, PIN prompts, signage or other incentives), including but not limited to analyses of the business risks or benefits of such efforts, analyses of the effect of such efforts, in transaction volume or otherwise, and documents relating to any possible or actual decision to discontinue issuance of PIN debit cards or signature debit cards in any part of the country.

### SUBPOENA REQUEST FOR PRODUCTION NO. 2:

All high-level documents relating to any actual, potential or possible efforts or plans by you or by merchants to encourage, discourage, influence or promote the use of POS debit transactions (either PIN or signature) by cardholders as opposed to checks (including fees imposed, rewards programs, promotions, BIN management, PIN prompts, signage, or other incentives), including but not limited to analyses of the business risks or benefits of such efforts or analyses of the effect of such efforts, in transaction volume or otherwise.

### SUBPOENA REQUEST FOR PRODUCTION NO. 3:

Documents sufficient to show the beginning date and, if applicable, ending date of any actual efforts by you or by merchants (including fees imposed, efforts to inform customers of signature debit benefits, rewards programs, promotions, BIN management, PIN prompts, signage, or other incentives) to encourage, discourage, influence or promote the use of any particular POS payment method by cardholders, including but not limited to signature debit or PIN debit.

3

SF:21532962.2/2023550-0000300137

## SUBPOENA REQUEST FOR PRODUCTION NO. 4:

All high-level documents relating to competition between payment methods at the POS, including signature debit, PIN debit cards, paper checks, electronic checks (or the networks that are used to process the respective transactions), or cash, including the extent to which any of the payment methods can be substituted for one another at the POS, efforts by issuers (including you), networks or merchants to influence customers to make on type of transaction versus the other, and the respective costs to merchants of the payment methods, the time and procedures for settlement of each payment method, the means of authenticating each payment method, the respective fraud or charge-back rates or other costs associated with each payment method, and the convergence of the payment methods with respect to any of those characteristics.

## SUBPOENA REQUEST FOR PRODUCTION NO. 5:

All high level documents relating to the actual or potential effect of the settlement of the Wal-Mart litigation on debit issuers (including you), network services providers or merchants, including but not limited to competition between signature debit and PIN debit and pricing of either or both.

## SUBPOENA REQUEST FOR PRODUCTION NO. 6:

Documents sufficient to show the monthly volume of POS signature debit card transactions and POS PIN debit card transactions made by your cardholders from January 1, 1998 to the present.

## SUBPOENA REQUEST FOR PRODUCTION NO. 7:

Documents sufficient to show the monthly volume of POS signature debit card transactions and POS PIN debit card transactions made by your cardholders from January 1, 1998 to the present that were authorized or settled without being switched by a network services provider (sometimes called "on-us" transactions).

## SUBPOENA REQUEST FOR PRODUCTION NO. 8:

Documents sufficient to show any forecasts of the volume of POS signature debit card transactions or POS PIN debit card transactions by your cardholders for the period from the date of your response to January 1, 2007.

## SUBPOENA REQUEST FOR PRODUCTION NO. 9:

Documents sufficient to show the number of debit cards issued by you that are enabled to allow the cardholder to make POS PIN debit card transactions, POS signature debit card transactions, or both.

## SUBPOENA REQUEST FOR PRODUCTION NO. 10:

Documents sufficient to show your actual or projected revenues, costs and profitability of PIN debit, signature debit, and check (paper or electronic) transactions at the POS, including without limitation any pro formas, financial analyses or forecasts, and documents

4

SF-21/133362.2/2023550-2000300737

Case 3:03-mc-00143-GCM   Document 2   Filed 11/21/03   Page 21 of 113

reflecting or referring to the comparative or relative profitability of PIN debit, signature debit, and/or check (paper or electronic) transactions at the POS.

## SUBPOENA REQUEST FOR PRODUCTION NO. 11:

All high level documents reflecting, referring or relating to any actual or potential decision by you to join or terminate participation in a PIN debit network, or the reasons for, or factors or circumstances considered in connection with, such decisions, including but not limited to internal analyses, requests for proposals, and documents reflecting or referring to contract terms or proposals or negotiations concerning interchange fees, switch fees, membership fees, financial incentives, marketing incentives, governance, profit-sharing, conversion costs, and transaction volumes or minimums.

## SUBPOENA REQUEST FOR PRODUCTION NO. 12:

All high level documents discussing, comparing or analyzing the interchange fees, switch fees or other per-transaction fees of any network services provider, including any documents comparing rates offered by different networks or across alternative payments forms and any documents reflecting or referring to communications between you and any network services provider regarding the level of its fees.

## SUBPOENA REQUEST FOR PRODUCTION NO. 13:

Documents sufficient to identify efforts you have made to become any specific issuer's on-us processor for PIN debit card POS network services, including the terms of any offers.

## SUBPOENA REQUEST FOR PRODUCTION NO. 14:

All high-level documents relating to your plans or strategies with respect to the processing of on-us transactions.

## SUBPOENA REQUEST FOR PRODUCTION NO. 15:

All high level documents relating to the cost to merchants of accepting various payment methods for POS transactions, including PIN debit, signature debit, checks (paper and electronic) and cash, including but not limited to documents that compare or otherwise analyze the relative costs of signature, PIN debit, checks, and/or cash.

## SUBPOENA REQUEST FOR PRODUCTION NO. 16:

All high level documents referring or relating to decisions by merchants whether or not to install, expand the number of, or discontinue the use of PIN debit terminals, including documents reflecting any given merchant's installed base of PIN debit terminals, the cost of installing PIN debit terminals, efforts by providers of network services to encourage merchants to install PIN debit terminals, and any projections of any given merchant's need to upgrade, repair or replace PIN debit terminals and the associated costs.

SF:215329632/2/07/2550-0000/00737

5

## SUBPOENA REQUEST FOR PRODUCTION NO. 17:

All documents relating to any potential or actual decision by merchants to accept or discontinue accepting network services at the POS, including requests for information or analysis from a merchant processor or acquirer (including such requests to your processing division), requests for proposal, requests for bids, other solicitations or negotiations (with or from network services providers of merchant processors or acquirers), analyses of prices or the reliability of network services, comparisons between network service providers, contracts for network services, and documents relating to the costs or benefits of accepting or discontinuing accepting some or all network services, including but not limited to STAR or NYCE.

## SUBPOENA REQUEST FOR PRODUCTION NO. 18:

All documents referring or relating to the ATM & Debit Forum held in New Orleans, Louisiana, on October 27-28, 2003, including but not limited to a copy of the materials presented by Robert E. White, Debit Card Executive for Bank of America, any notes or supporting documents relating to the preparation of Mr. White's presentation, and any subsequently created materials which refer or relate to the Forum.

## SUBPOENA REQUEST FOR PRODUCTION NO. 19:

All documents relating to the merger, including but not limited to documents reflecting your analysis or opinion of the merger and documents relating to communications with the United States Department of Justice, any other federal or state governmental entity or anyone else regarding the merger.

## SUBPOENA REQUEST FOR PRODUCTION NO. 20:

Documents sufficient to identify the names and titles of each person whose files were searched to produce documents responsive to each of the foregoing requests.

6

SF:21332962.2/2023350-0900300737

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, *et al.*,

        Plaintiffs,

v.

FIRST DATA CORPORATION and CONCORD
EFS, INC.,

        Defendants.

Civil Action No. 1:03 CV02169 (RMC)

Filed: October 23, 2003

### JOINTLY PROPOSED PROTECTIVE ORDER

Pursuant to Fed. R. Civ. P. 26(c)(7), and in the interest of ensuring an efficient and prompt resolution of this action and of protecting information of the parties and non-parties from improper disclosure, the undersigned hereby stipulate, subject to approval and entry by the Court, to the following Protective Order:

### A.   DEFINITIONS

    1.   As used herein:

        (a)   "confidential information" means any trade secret, or other confidential research, development, or commercial information of a party or protected person, as such terms are used in Fed. R. Civ. P. 26(c)(7).

        (b)   "disclosed" means directly or indirectly shown, divulged, revealed, produced, described, transmitted, or otherwise communicated, in whole or in part;

        (c)   "document" is defined as the term is used in Fed. R. Civ. P. 34(a);

        (d)   "party" or "parties" means one or more of the plaintiffs or one or more of the defendants;

        (e)   "protected person" or "protected persons" means any non-party who voluntarily or in response to a Civil Investigative Demand from the Department of Justice

SF:21253341.3/2021500-0000300737

or from a plaintiff State, or to formal or informal discovery in this action produced or produces
any information to any party in connection with this action or the Department of Justice's or
plaintiff States' investigations of the matters at issue in this action;

(f)     "protected information" means information designated as
"BUSINESS SENSITIVE" or "CONFIDENTIAL" as defined below; and

(g)     "this action" means the above-captioned action pending in this
Court, including any discovery, pretrial, trial, post-trial, or appellate proceedings.

**B. DESIGNATION OF PROTECTED INFORMATION**

2.     A party or protected person may designate as "BUSINESS SENSITIVE"
any document, testimony, affidavit, declaration, or information it hereafter discloses, either
voluntarily or pursuant to discovery in this action, to any party in connection with this action, to
the extent such information constitutes confidential information as defined in this Order. Such
designations shall constitute a representation to the Court that such party or protected person
(and counsel, if any) in good faith believes that the information so designated constitutes
confidential information.

3.     A party or protected person may designate as "CONFIDENTIAL" any
document, testimony, affidavit, declaration, or information it hereafter discloses, either
voluntarily or pursuant to discovery in this action, to any party in connection with this action,
only if the party or protected person believes in good faith that the material is highly sensitive
and which, if disclosed to persons other than those listed in paragraph 9, is likely to cause
substantial competitive harm.

4.     Documents, deposition transcripts, affidavits, declarations, or any
information containing confidential information produced or provided by any party or any
protected person, that the producing party or producing protected person seeks to designate as
"BUSINESS SENSITIVE" or "CONFIDENTIAL" in accordance with this Order, shall be
designated as such by placing on or affixing to the document or transcript containing confidential
information (in such a manner as will not interfere with the document's legibility), the

SP:21532341.9/2023030-0000300737

2

Case 3:03-mc-00143-GCM   Document 2   Filed 11/21/03   Page 25 of 113

designation "BUSINESS SENSITIVE" or "CONFIDENTIAL" as appropriate, or any other

appropriate notice, together with an indication of the portion or portions of the document

considered to be confidential information. With respect to electronic documents, the party or

protected person at the time such information is produced shall specify in writing the information

that is "BUSINESS SENSITIVE" or "CONFIDENTIAL."

     5.    A party or protected person that has previously testified in deposition,

provided an affidavit or declaration, or produced documents or other information in any form in

connection with the investigation of the matters at issue in this action to a party voluntarily in

response to an informal discovery request or pursuant to the Hart-Scott-Rodino Antitrust

Improvement Act (15 U.S.C. § 18a) or the Antitrust Civil Process Act (15 U.S.C. §§ 1311-1314),

may designate any such deposition testimony, affidavit, declaration, document, or information

submitted in response to such discovery requests as "BUSINESS SENSITIVE" or

"CONFIDENTIAL," to the extent such information constitutes protected information as defined

in this Order. A party or protected person shall make confidentiality designations for

depositions, affidavits, declarations, documents, and information obtained by a party prior to the

filing of the Complaint in this action within three business days of entry or notice of entry of this

Order (whichever comes later), and in the meantime, the parties shall treat all material as

"CONFIDENTIAL" pursuant to this Order. Deposition testimony, documents, affidavits, or

declarations containing confidential information produced previously to the Division during the

investigation of the transaction at issue in this action by any protected person and or party that

such person seeks to designate as confidential shall be designated as "BUSINESS SENSITIVE"

or "CONFIDENTIAL" by forwarding a letter to all parties identifying the confidential

information (by ranges of document identification numbers or page and line numbers where

applicable, or other appropriate means) to be so designated. If the entire deposition, document,

affidavit, or declaration is not confidential, the protected person shall specify the portions of the

document, deposition, affidavit, or declaration that contains confidential information. Such

designation shall be communicated to all parties.

3

SF:\1632841.1\202260M-00000007737

6.      Any or all documents and other information delivered to one or more of the plaintiffs prior to the filing of the Complaint in this action by any party or protected person, may be presumptively designated, in whole or in part, "CONFIDENTIAL" by the party or protected person producing such documents or other information by communicating such designation to the receiving party. With respect to materials and testimony received by plaintiffs prior to the filing of the Complaint in this action, the parties agree, in view of time constraints, that a party's or protected person's designation of those materials in whole as "CONFIDENTIAL" is, under the circumstances, a good faith designation in accordance with paragraph 3 above. Such designations shall be communicated to all parties, who shall then treat all such documents or other information produced by that party or protected person as "CONFIDENTIAL". In addition, any party or protected person may similarly designate the transcripts of, and exhibits marked at, any depositions of employees of that party or protected person, taken by one or more plaintiffs, prior to the filing of the Complaint in this action, as "CONFIDENTIAL". All documents and other information designated "CONFIDENTIAL" under this paragraph are subject to the provisions of paragraph 15.

7.      All transcripts of depositions taken in this action after the filing of the Complaint shall be treated as if designated "CONFIDENTIAL" for a period of five business days after a full and complete copy of the transcript has been available to the deponent or deponent's counsel. Any deponent or counsel for that deponent or counsel for a party may designate during the deposition or during the five-day period after the transcript is available from the court reporter any portion of the transcript as "BUSINESS SENSITIVE" or "CONFIDENTIAL" by denominating by page and line, and by designating any exhibits, that are to be considered "BUSINESS SENSITIVE" or "CONFIDENTIAL". Such designation shall be communicated to all parties.

C.      DISCLOSURE OF "BUSINESS SENSITIVE" INFORMATION

8.      Except as otherwise authorized by this Order, information designated as "BUSINESS SENSITIVE" shall be used only in connection with this action, shall not be

SF-21632041 3/3K22055-0000200737

4

disclosed to any person other than the individuals set forth below, and may be disclosed only as necessary in connection with this action to the individuals set forth below:

(a)  the Court and all persons assisting the Court in this action, including court reporters and stenographic or clerical personnel;

(b)  plaintiffs' attorneys and employees, and anyone retained to assist the plaintiffs in the preparation or trial of this action, including contract paralegals, secretaries, other administrative personnel and any persons employed or retained as data base managers and their employees;

(c)  no more than two specifically identified inside counsel for each party, as may be agreed upon by the parties or (in the absence of agreement) ordered by the Court, as well as the designated inside counsel's necessary secretarial, clerical, administrative or support staff, provided that the inside counsel, secretarial, clerical, administrative or support staff are not involved in competitive decision making for the party (i.e., development marketing or pricing decisions) as to the subjects of the information designated as "BUSINESS SENSITIVE";

(d)  outside counsel of record for defendants and the employees of such outside counsel including paralegals, secretaries, and other administrative personnel and any persons employed or retained as data base managers and their employees, provided that such persons are not employed or affiliated in any other way with any defendant;

(e)  employees of third-party contractors of the parties involved solely in providing copying services or litigation support services such as organizing, filing, coding, converting, storing, or retrieving material connected with this action, provided that such persons are not employed or affiliated in any other way with any defendant;

(f)  experts or consultants retained by a party solely to assist in the conduct of this action, including employees of the firm with which the expert or consultant is associated to the extent necessary for purposes of this action only, provided that such experts and staff are not employed or affiliated in any other way with any defendant and provided that such expert or consultant has executed Appendix A hereto;

IF:#:152:44.5/2033000-00000007737

Case 3:03-mc-00143-GCM   Document 2   Filed 11/21/03   Page 28 of 113

(g)    authors, addressees, and recipients of particular information designated as confidential solely to the extent of disclosing such information of which they are an author, addressee, or recipient;

(h)    persons who have had, or whom any counsel for any party in good faith believes to have had, prior access to confidential information, or who have been participants in a communication that is the subject of the confidential information and from whom verification of or other information about that access or participation is sought, solely to the extent of disclosing such information to which they have or may have had access or that is the subject of the communication in which they have or may have participated, except that, unless and until counsel confirms that any such persons have had access or were participants, only as much of the information may be disclosed as may be necessary to confirm the person's access or participation.

(i)    subject to the provisions of paragraph 10, other persons not included in the above subparagraphs who are examined by deposition in this action.

## D.    DISCLOSURE OF "CONFIDENTIAL" INFORMATION

9.    Except as otherwise authorized by this Order, information designated as "CONFIDENTIAL" shall be used only, in connection with this action, shall not be disclosed to any person other than the individuals set forth below, and may be disclosed only as necessary in connection with this action to the individuals set forth below:

(a)    the Court and all persons assisting the Court in this action, including court reporters and stenographic or clerical personnel;

(b)    plaintiffs' attorneys and employees, and anyone retained to assist the plaintiffs in the preparation or trial of this action, including contract paralegals, secretaries, other administrative personnel and any persons employed or retained as data base managers and their employees;

(c)    outside counsel of record for defendants and the employees of such outside counsel including paralegals, secretaries, and other administrative personnel and any

5

BF-215A2341 3/703AMOCOIB00737

Case 3:03-mc-00143-GCM    Document 2    Filed 11/21/03    Page 29 of 113

persons employed or retained as data base managers and their employees, provided that such

persons are not employed or affiliated in any other way with any defendant;

(d)    employees of third-party contractors of the parties involved solely

in providing copying services or litigation support services such as organizing, filing, coding,

converting, storing, or retrieving material connected with this action, provided that such persons

are not employed or affiliated in any other way with any defendant;

(e)    experts or consultants retained by a party solely to assist in the

conduct of this action, including employees of the firm with which the expert or consultant is

associated to the extent necessary for purposes of this action only, provided that such experts and

staff are not employed or affiliated in any other way with any defendant and provided that such

expert or consultant has executed Appendix A hereto;

(f)    authors, addressees, and recipients of particular information

designated as confidential solely to the extent of disclosing such information of which they are

an author, addressee, or recipient;

(g)    persons who have had, or whom any counsel for any party in good

faith believes to have had, prior access to information designated "CONFIDENTIAL", or who

have been participants in a communication that is the subject of the information designated

"CONFIDENTIAL" and from whom verification of or other information about that access or

participation is sought, solely to the extent of disclosing such information to which they have or

may have had access or that is the subject of the communication in which they have or may have

participated, except that, unless and until counsel confirms that any such persons have had access

or were participants, only as much of the information may be disclosed as may be necessary to

confirm the person's access or participation.

(h)    subject to the provisions of paragraph 10, other persons not included in the

above subparagraphs who are examined by deposition in this action.

10.    Subject to the exceptions stated in this paragraph, before disclosure of

protected information is made to any person or persons not authorized to receive the information

7

ST:216423e4.3/202396O-0000300737

under the provisions of Paragraph 8 or 9 of this Order, the party wishing to make such a disclosure shall give at least five business days' advance notice in writing, via facsimile, to the party or protected person who provided the protected information, stating the names, addresses, and employers of the person(s) to whom the disclosure will be made. The notice shall identify with particularity the documents or specific parts of the information to be disclosed, including the production number of the documents. If, within the five-business-day period, an objection is made regarding a disclosure, disclosure of the protected information shall not be made pending a ruling by the Court. The Court will permit access upon such terms as it deems proper, unless the party or protected person objecting to the proposed disclosure shows good cause why the proposed disclosure should not be permitted. The notice provisions of this Paragraph shall not apply with respect to any deposition, pretrial, or trial testimony of any employee of any party or protected person designating particular information as protected information; any author, addressee, or recipient of particular information designated protected information; or any persons who have had, or whom any counsel for any party in good faith believes to have had, prior access to information designated as protected information, or who have been participants in a communication that is the subject of the protected information at issue in the deposition or testimony of such witness.

11.    Each individual described in Paragraph 8, 9 and 10 above, to whom protected information is disclosed, shall not disclose that information to any other individual, except as provided in this Order, or use it for any purpose other than in connection with this action. Before any protected information may be disclosed to any person described in Paragraph 8, 9 or 10 above, he or she shall have first read this Order or shall have otherwise been instructed in his or her obligations under the Order by counsel for a party. Additionally, before any protected information may be disclosed to any expert or consultant described in Subparagraph 8(f) or 9(s), he or she shall have executed the agreement included as Appendix A hereto. Counsel for the party making the disclosure shall maintain the original of such executed agreement for a period of at least one year following the final resolution of this action.

GP-2164241.8/2015555-0000300737

8

12.    Notwithstanding the provisions of this Protective Order, nothing in this Order shall:

(a)    limit a party's or protected person's use or disclosure of its own protected information;

(b)    prevent disclosure of protected information with the consent of counsel for the designating party or protected person;

(c)    prevent plaintiffs, subject to taking appropriate steps to preserve the confidentiality of such information, from disclosing protected information:  (i) to duly-authorized representatives of the Executive Branch of the United States Government; (ii) in the course of legal proceedings to which the United States or any plaintiff State is a party; (iii) for the purpose of securing compliance with any Final Judgment in this action; or (iv) for law enforcement purposes or as otherwise required by law. Unless otherwise prohibited by law or regulation, the plaintiffs will endeavor to promptly inform the party or protected person who designated the information as protected information if disclosure pursuant to this paragraph is made.

## D. USE OF PROTECTED INFORMATION IN LITIGATION

13.    All protected information contained or discussed in any pleading, motion, exhibit, or other paper filed with the Court shall be filed under seal. Where possible, only portions of filings with the court containing protected information shall be filed under seal. Information filed under seal shall be placed in a sealed envelope/box with the endorsements required by the applicable rules of the Court and/or filed in accordance with the electronic filing rules of the Court. The Clerk shall keep such papers under seal until further order of this Court; provided however, that such papers shall be furnished to the Court and to persons and entities who may receive protected information pursuant to the Protective Order. Upon or within five business days after the filing of any paper containing protected information, the filing party shall file on the public record a copy of the paper with the protected information deleted.

BF:215325411.5/2123444-000080007 37

9

14. The parties shall provide protected persons with notice of potential use of any protected information produced by them if and when such materials are listed as potential exhibits if such exhibits are to be made part of the public record. The parties shall give protected persons notice as soon as practicable after protected information which is not listed as an exhibit is determined to be used by counsel for a party in the course of examination or cross-examination at trial if such protected information is to be disclosed as part of the public record. Nothing in this paragraph shall require any advance notice of the use of any document of a party in cross-examining a witness for that party, except immediately before such use. A party or protected person may request the Court to establish and apply protective procedures (including, without limitation, *in camera* review of protected information, sealing of portions of transcripts containing or discussing confidential information and/or excluding persons from the courtroom who are not described in Paragraph 8, 9 or 10 when protected information is shown or discussed) governing the disclosure of protected information at any hearing or trial in this case.

## E. OTHER PROCEDURES

15. If a party believes that another party or protected person has designated material as "BUSINESS SENSITIVE" or "CONFIDENTIAL" that is not entitled to such protection, the party seeking disclosure shall make a good faith attempt to resolve the disagreement over the classification of the material with the protected person or party. If the parties and/or the protected person cannot resolve the matter, the party seeking disclosure has the burden to file a motion, notify all parties and affected protected persons of the filing of the motion, identify each document that is the subject of the motion (*e.g.*, by Bates-number or title, author, recipient and date) and submit the matter to the Court for resolution. In the event that a motion is filed challenging a confidentiality designation, the person designating the material shall respond within the time-period allowed for opposition to the motion. Failure to respond shall constitute a waiver of opposition to the motion.

16. This Order shall be without prejudice to the right of any party to bring before the Court the question of whether any particular information designated "BUSINESS

SF:21632341.3/2223580-0000300737

10

SENSITIVE" or "CONFIDENTIAL" is appropriately designated, or whether any particular
information designated "BUSINESS SENSITIVE" or "CONFIDENTIAL" is or is not
discoverable or admissible evidence at any hearing or trial of this action. Nothing in this Order
shall be construed to effect an abrogation, waiver or limitation of any kind on the right of the
parties or protected persons to assert any applicable discovery or trial privilege. No party
concedes by complying with this Order that any information designated by any party or protected
person as protected information is in fact confidential as that term is defined in Paragraph 1(a) of
this Order. However, no information designated as "BUSINESS SENSITIVE" or
"CONFIDENTIAL" pursuant to this Order shall be disclosed except as provided herein unless
and until the Court orders the release of such information from the confidentiality provisions of
this Order.

17    Any production of information without its being designated as
"BUSINESS SENSITIVE" or "CONFIDENTIAL" shall not thereby be deemed a waiver of any
claim of confidentiality as to such information, and the same may thereafter be designated
"BUSINESS SENSITIVE" or "CONFIDENTIAL". Upon receiving notice from a party or
protected person that protected information has not been appropriately so denominated, all such
information shall be redenominated and treated appropriately. Any such subsequent designation,
however, shall not apply retroactively to any previously disclosed information for which
disclosure was proper when made.

18.    This Order shall not apply to information in the public domain or obtained
from other sources regardless of whether such information is also contained in materials
designated as confidential pursuant to this Order.

19.    Upon entry of this Order, the parties shall provide notice and a copy of
this Order to all protected persons who provided them documents or information in this action
prior to entry of this Order.

20.    The parties, in conducting discovery from non-parties, shall attach to such
discovery requests a copy of this Order so as to appraise such non-parties of their rights.

SF-21012341.3/9023550-0000860737

11

## F. PROCEDURES UPON TERMINATION OF LITIGATION

21.     Within 90 days after receiving notice of the entry of an order, judgment or decree terminating this action, all persons having received protected information shall, at the election of the party or protected person who produced the information, either return such material containing such information and all copies thereof to counsel for the party or protected person that produced it, or destroy all such material and certify that fact in writing. The plaintiffs and their counsel and outside counsel for any defendant shall be entitled to retain court papers, deposition and trial transcripts and exhibits, and attorney-work product (including discovery material containing protected information), provided that plaintiffs' employees, and defendants' outside counsel, and employees of such outside counsel shall not disclose the portions of court papers, deposition transcripts, exhibits or attorney-work product containing protected information to any person except pursuant to court order, or agreement with the party or protected person that produced the protected information. All protected information returned to the parties or their counsel by the Court likewise shall be disposed of in accordance with this Paragraph. Nothing in this provision, however, shall restrict the rights of the plaintiffs to retain and use protected information for law enforcement purposes or as otherwise required by law.

## G. RIGHT TO SEEK MODIFICATION

22.     The parties reserve the right to apply to the Court for any order modifying this Order or seeking further protections against discovery or other use of protected information. Any protected person requiring further confidentiality protection than is provided by this Order may petition the Court for a separate order governing disclosure of its confidential material. All hearings in this action, including the trial, will presumptively be open to the public, except that this Court will issue further orders as necessary to protect any protected person's or party's protected information from improper disclosure.

12

&F-3\\1:82341.1/202.2608-00003007.27

| FOR PLAINTIFF | FOR DEFENDANTS |
|---|---|
| UNITED STATES OF AMERICA | FIRST DATA CORPORATION |
| U.S. Department of Justice<br>Antitrust Division<br>Networks and Technology Enforcement<br>Section<br>600 E Street, N.W., Suite 9500<br>Washington, D.C. 20530<br>202/307-6200 | CONCORD EFS, INC. |
| FOR PLAINTIFF STATES | |
| STATE OF CONNECTICUT<br>STATE OF ILLINOIS<br>STATE OF LOUISIANA<br>COMMONWEALTH OF<br>MASSACHUSETTS<br>STATE OF NEW YORK<br>STATE OF OHIO<br>STATE OF TEXAS<br>DISTRICT OF COLUMBIA | |

IT IS SO ORDERED.

Dated: November ___, 2003

UNITED STATES DISTRICT JUDGE

BF:1532341.82=22400-0009800737

13

Case 3:03-mc-00143-GCM   Document 2   Filed 11/21/03   Page 36 of 113

| FOR PLAINTIFF | FOR DEFENDANTS |
|---|---|
| UNITED STATES OF AMERICA | FIRST DATA CORPORATION |
| U.S. Department of Justice<br>Antitrust Division<br>Networks and Technology Enforcement<br>Section<br>600 E Street, N.W., Suite 9500<br>Washington, D.C. 20530<br>202/307-6200 | CONCORD EFS, INC. |
| FOR PLAINTIFF STATES | |
| STATE OF CONNECTICUT<br>STATE OF ILLINOIS<br>STATE OF LOUISIANA<br>COMMONWEALTH OF<br>MASSACHUSETTS<br>STATE OF NEW YORK<br>STATE OF OHIO<br>STATE OF TEXAS<br>DISTRICT OF COLUMBIA | |

IT IS SO ORDERED.

Dated: November __, 2003

_____
UNITED STATES DISTRICT JUDGE

13

BP 2159.2941.1/2023660-0002300737

APPENDIX A

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, *et al.*,

      Plaintiffs, .

      v.

FIRST DATA CORPORATION and CONCORD
EFS, INC.,

      Defendants.

Civil Action No. 1:03 CV02169 (RMC)

Filed: October 23, 2003

## AGREEMENT CONCERNING CONFIDENTIALITY

I,_____, am employed as a _____ by
_____. I hereby certify that:

    1.    I have read the Protective Order entered in the above-captioned action, and understand its terms.

    2.    I agree to be bound by the terms of the Protective Order entered in the above-captioned action. I agree to use the information provided to me only for the purposes of this litigation.

    3.    I understand that my failure to abide by the terms of the Protective Order entered in the above-captioned action will subject me, without limitation, to civil and criminal penalties for contempt of Court.

    4.    I submit to the jurisdiction of the United States District Court for the District of Columbia solely for the purpose of enforcing the terms of the Protective Order entered in the above-captioned action and freely and knowingly waive any right I may otherwise have to object to the jurisdiction of said Court.

    5.    I make this certificate this _____ day of _____,
2003.

14

_____
(SIGNATURE)

15

0F:2\532341.3/2023840.0000100787

Case 3:03-mc-00143-GCM   Document 2   Filed 11/21/03   Page 39 of 113

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, *et al.*,

        Plaintiffs,

      v.

FIRST DATA CORPORATION and CONCORD
EFS, INC.,

        Defendants.

Civil Action No. 1:03CV02169 (RMC)

Filed: October 23, 2003

## JOINTLY PROPOSED PROTECTIVE ORDER

        Pursuant to Fed. R. Civ. P. 26(c)(7), and in the interest of ensuring an efficient and prompt resolution of this action and of protecting information of the parties and non-parties from improper disclosure, the undersigned hereby stipulate, subject to approval and entry by the Court, to the following Protective Order:

## A.    DEFINITIONS

        1.    As used herein:

        (a)    "confidential information" means any trade secret, or other confidential research, development, or commercial information of a party or protected person, as such terms are used in Fed. R. Civ. P. 26(c)(7).

        (b)    "disclosed" means directly or indirectly shown, divulged, revealed, produced, described, transmitted, or otherwise communicated, in whole or in part;

        (c)    "document" is defined as the term is used in Fed. R. Civ. P. 34(a);

        (d)    "party" or "parties" means one or more of the plaintiffs or one or more of the defendants;

        (e)    "protected person" or "protected persons" means any non-party who voluntarily or in response to a Civil Investigative Demand from the Department of Justice

EXHIBIT

B

SF:21532341.3/2023550-0000300737

or from a plaintiff State, or to formal or informal discovery in this action produced or produces any information to any party in connection with this action or the Department of Justice's or plaintiff States' investigations of the matters at issue in this action;

> (f) "protected information" means information designated as "BUSINESS SENSITIVE" or "CONFIDENTIAL" as defined below; and

> (g) "this action" means the above-captioned action pending in this Court, including any discovery, pretrial, trial, post-trial, or appellate proceedings.

## B. DESIGNATION OF PROTECTED INFORMATION

2. A party or protected person may designate as "BUSINESS SENSITIVE" any document, testimony, affidavit, declaration, or information it hereafter discloses, either voluntarily or pursuant to discovery in this action, to any party in connection with this action, to the extent such information constitutes confidential information as defined in this Order. Such designations shall constitute a representation to the Court that such party or protected person (and counsel, if any) in good faith believes that the information so designated constitutes confidential information.

3. A party or protected person may designate as "CONFIDENTIAL" any document, testimony, affidavit, declaration, or information it hereafter discloses, either voluntarily or pursuant to discovery in this action, to any party in connection with this action, only if the party or protected person believes in good faith that the material is highly sensitive and which, if disclosed to persons other than those listed in paragraph 9, is likely to cause substantial competitive harm.

4. Documents, deposition transcripts, affidavits, declarations, or any information containing confidential information produced or provided by any party or any protected person, that the producing party or producing protected person seeks to designate as "BUSINESS SENSITIVE" or "CONFIDENTIAL" in accordance with this Order, shall be designated as such by placing on or affixing to the document or transcript containing confidential information (in such a manner as will not interfere with the document's legibility), the

2

designation "BUSINESS SENSITIVE" or "CONFIDENTIAL" as appropriate, or any other appropriate notice, together with an indication of the portion or portions of the document considered to be confidential information. With respect to electronic documents, the party or protected person at the time such information is produced shall specify in writing the information that is "BUSINESS SENSITIVE" or "CONFIDENTIAL".

     5.    A party or protected person that has previously testified in deposition, provided an affidavit or declaration, or produced documents or other information in any form in connection with the investigation of the matters at issue in this action to a party voluntarily in response to an informal discovery request or pursuant to the Hart-Scott-Rodino Antitrust Improvement Act (15 U.S.C. § 18a) or the Antitrust Civil Process Act (15 U.S.C. §§ 1311-1314), may designate any such deposition testimony, affidavit, declaration, document, or information submitted in response to such discovery requests as "BUSINESS SENSITIVE" or "CONFIDENTIAL," to the extent such information constitutes protected information as defined in this Order. A party or protected person shall make confidentiality designations for depositions, affidavits, declarations, documents, and information obtained by a party prior to the filing of the Complaint in this action within three business days of entry or notice of entry of this Order (whichever comes later), and in the meantime, the parties shall treat all material as "CONFIDENTIAL" pursuant to this Order. Deposition testimony, documents, affidavits, or declarations containing confidential information produced previously to the Division during the investigation of the transaction at issue in this action by any protected person and or parts that such person seeks to designate as confidential shall be designated as "BUSINESS SENSITIVE" or "CONFIDENTIAL" by forwarding a letter to all parties identifying the confidential information (by ranges of document identification numbers or page and line numbers where applicable, or other appropriate means) to be so designated. If the entire deposition, document, affidavit, or declaration is not confidential, the protected person shall specify the portions of the document, deposition, affidavit, or declaration that contains confidential information. Such designation shall be communicated to all parties.

SF:21532341.3/2023550-0000300737

6. Any or all documents and other information delivered to one or more of the plaintiffs prior to the filing of the Complaint in this action by any party or protected person, may be presumptively designated, in whole or in part, "CONFIDENTIAL" by the party or protected person producing such documents or other information by communicating such designation to the receiving party. With respect to materials and testimony received by plaintiffs prior to the filing of the Complaint in this action, the parties agree, in view of time constraints, that a party's or protected person's designation of those materials in whole as "CONFIDENTIAL" is, under the circumstances, a good faith designation in accordance with paragraph 3 above. Such designations shall be communicated to all parties, who shall then treat all such documents or other information produced by that party or protected person as "CONFIDENTIAL". In addition, any party or protected person may similarly designate the transcripts of, and exhibits marked at, any depositions of employees of that party or protected person, taken by one or more plaintiffs, prior to the filing of the Complaint in this action, as "CONFIDENTIAL". All documents and other information designated "CONFIDENTIAL" under this paragraph are subject to the provisions of paragraph 15.

7. All transcripts of depositions taken in this action after the filing of the Complaint shall be treated as if designated "CONFIDENTIAL" for a period of five business days after a full and complete copy of the transcript has been available to the deponent or deponent's counsel. Any deponent or counsel for that deponent or counsel for a party may designate during the deposition or during the five-day period after the transcript is available from the court reporter any portion of the transcript as "BUSINESS SENSITIVE" or "CONFIDENTIAL" by denominating by page and line, and by designating any exhibits, that are to be considered "BUSINESS SENSITIVE" or "CONFIDENTIAL". Such designation shall be communicated to all parties.

## C. DISCLOSURE OF "BUSINESS SENSITIVE" INFORMATION

8. Except as otherwise authorized by this Order, information designated as "BUSINESS SENSITIVE" shall be used only in connection with this action, shall not be

4

disclosed to any person other than the individuals set forth below, and may be disclosed only as necessary in connection with this action to the individuals set forth below:

(a) the Court and all persons assisting the Court in this action, including court reporters and stenographic or clerical personnel;

(b) plaintiffs' attorneys and employees, and anyone retained to assist the plaintiffs in the preparation or trial of this action, including contract paralegals, secretaries, other administrative personnel and any persons employed or retained as data base managers and their employees;

(c) no more than two specifically identified inside counsel for each party, as may be agreed upon by the parties or (in the absence of agreement) ordered by the Court, as well as the designated inside counsel's necessary secretarial, clerical, administrative or support staff, provided that the inside counsel, secretarial, clerical, administrative or support staff are not involved in competitive decision making for the party (*i.e.*, development, marketing or pricing decisions) as to the subjects of the information designated as "BUSINESS SENSITIVE".

(d) outside counsel of record for defendants and the employees of such outside counsel including paralegals, secretaries, and other administrative personnel and any persons employed or retained as data base managers and their employees, provided that such persons are not employed or affiliated in any other way with any defendant;

(e) employees of third-party contractors of the parties involved solely in providing copying services or litigation support services such as organizing, filing, coding, converting, storing, or retrieving material connected with this action, provided that such persons are not employed or affiliated in any other way with any defendant;

(f) experts or consultants retained by a party solely to assist in the conduct of this action, including employees of the firm with which the expert or consultant is associated to the extent necessary for purposes of this action only, provided that such experts and staff are not employed or affiliated in any other way with any defendant and provided that such expert or consultant has executed Appendix A hereto;

5

(g)     authors, addressees, and recipients of particular information designated as confidential solely to the extent of disclosing such information of which they are an author, addressee, or recipient;

(h)     persons who have had, or whom any counsel for any party in good faith believes to have had, prior access to confidential information, or who have been participants in a communication that is the subject of the confidential information and from whom verification of or other information about that access or participation is sought, solely to the extent of disclosing such information to which they have or may have had access or that is the subject of the communication in which they have or may have participated, except that, unless and until counsel confirms that any such persons have had access or were participants, only as much of the information may be disclosed as may be necessary to confirm the person's access or participation.

(i)     subject to the provisions of paragraph 10, other persons not included in the above subparagraphs who are examined by deposition in this action.

## D.     DISCLOSURE OF "CONFIDENTIAL" INFORMATION

9.     Except as otherwise authorized by this Order, information designated as "CONFIDENTIAL" shall be used only in connection with this action, shall not be disclosed to any person other than the individuals set forth below, and may be disclosed only as necessary in connection with this action to the individuals set forth below:

(a)     the Court and all persons assisting the Court in this action, including court reporters and stenographic or clerical personnel;

(b)     plaintiffs' attorneys and employees, and anyone retained to assist the plaintiffs in the preparation or trial of this action, including contract paralegals, secretaries, other administrative personnel and any persons employed or retained as data base managers and their employees;

(c)     outside counsel of record for defendants and the employees of such outside counsel including paralegals, secretaries, and other administrative personnel and any

6

persons employed or retained as data base managers and their employees, provided that such persons are not employed or affiliated in any other way with any defendant;

(d) employees of third-party contractors of the parties involved solely in providing copying services or litigation support services such as organizing, filing, coding, converting, storing, or retrieving material connected with this action, provided that such persons are not employed or affiliated in any other way with any defendant;

(e) experts or consultants retained by a party solely to assist in the conduct of this action, including employees of the firm with which the expert or consultant is associated to the extent necessary for purposes of this action only, provided that such experts and staff are not employed or affiliated in any other way with any defendant and provided that such expert or consultant has executed Appendix A hereto;

(f) authors, addressees, and recipients of particular information designated as confidential solely to the extent of disclosing such information of which they are an author, addressee, or recipient;

(g) persons who have had, or whom any counsel for any party in good faith believes to have had, prior access to information designated "CONFIDENTIAL", or who have been participants in a communication that is the subject of the information designated "CONFIDENTIAL" and from whom verification of or other information about that access or participation is sought, solely to the extent of disclosing such information to which they have or may have had access or that is the subject of the communication in which they have or may have participated, except that, unless and until counsel confirms that any such persons have had access or were participants, only as much of the information may be disclosed as may be necessary to confirm the person's access or participation.

(h) subject to the provisions of paragraph 10, other persons not included in the above subparagraphs who are examined by deposition in this action.

10. Subject to the exceptions stated in this paragraph, before disclosure of protected information is made to any person or persons not authorized to receive the information

7

Case 3:03-mc-00143-GCM   Document 2   Filed 11/21/03   Page 46 of 113

under the provisions of Paragraph 8 or 9 of this Order, the party wishing to make such a disclosure shall give at least five business days' advance notice in writing, via facsimile, to the party or protected person who provided the protected information, stating the names, addresses, and employers of the person(s) to whom the disclosure will be made. The notice shall identify with particularity the documents or specific parts of the information to be disclosed, including the production number of the documents. If, within the five-business-day period, an objection is made regarding a disclosure, disclosure of the protected information shall not be made pending a ruling by the Court. The Court will permit access upon such terms as it deems proper, unless the party or protected person objecting to the proposed disclosure shows good cause why the proposed disclosure should not be permitted. The notice provisions of this Paragraph shall not apply with respect to any deposition, pretrial, or trial testimony of any employee of any party or protected person designating particular information as protected information; any author, addressee, or recipient of particular information designated protected information; or any persons who have had, or whom any counsel for any party in good faith believes to have had, prior access to information designated as protected information, or who have been participants in a communication that is the subject of the protected information at issue in the deposition or testimony of such witness.

      11.    Each individual described in Paragraph 8, 9 and 10 above, to whom protected information is disclosed, shall not disclose that information to any other individual, except as provided in this Order, or use it for any purpose other than in connection with this action. Before any protected information may be disclosed to any person described in Paragraph 8, 9 or 10 above, he or she shall have first read this Order or shall have otherwise been instructed in his or her obligations under the Order by counsel for a party. Additionally, before any protected information may be disclosed to any expert or consultant described in Subparagraph 8(f) or 9(e), he or she shall have executed the agreement included as Appendix A hereto. Counsel for the party making the disclosure shall maintain the original of such executed agreement for a period of at least one year following the final resolution of this action.

8

12. Notwithstanding the provisions of this Protective Order, nothing in this Order shall:

(a) limit a party's or protected person's use or disclosure of its own protected information;

(b) prevent disclosure of protected information with the consent of counsel for the designating party or protected person;

(c) prevent plaintiffs, subject to taking appropriate steps to preserve the confidentiality of such information, from disclosing protected information: (i) to duly-authorized representatives of the Executive Branch of the United States Government; (ii) in the course of legal proceedings to which the United States or any plaintiff State is a party; (iii) for the purpose of securing compliance with any Final Judgment in this action; or (iv) for law enforcement purposes or as otherwise required by law. Unless otherwise prohibited by law or regulation, the plaintiffs will endeavor to promptly inform the party or protected person who designated the information as protected information if disclosure pursuant to this paragraph is made.

## D. USE OF PROTECTED INFORMATION IN LITIGATION

13. All protected information contained or discussed in any pleading, motion, exhibit, or other paper filed with the Court shall be filed under seal. Where possible, only portions of filings with the court containing protected information shall be filed under seal. Information filed under seal shall be placed in a sealed envelope/box with the endorsements required by the applicable rules of the Court and/or filed in accordance with the electronic filing rules of the Court. The Clerk shall keep such papers under seal until further order of this Court; provided however, that such papers shall be furnished to the Court and to persons and entities who may receive protected information pursuant to the Protective Order. Upon or within five business days after the filing of any paper containing protected information, the filing party shall file on the public record a copy of the paper with the protected information deleted.

SF 21532341.3/2023550-0000300737

Case 3:03-mc-00143-GCM   Document 2   Filed 11/21/03   Page 48 of 113

14. The parties shall provide protected persons with notice of potential use of any protected information produced by them if and when such materials are listed as potential exhibits if such exhibits are to be made part of the public record. The parties shall give protected persons notice as soon as practicable after protected information which is not listed as an exhibit is determined to be used by counsel for a party in the course of examination or cross-examination at trial if such protected information is to be disclosed as part of the public record. Nothing in this paragraph shall require any advance notice of the use of any document of a party in cross-examining a witness for that party, except immediately before such use. A party or protected person may request the Court to establish and apply protective procedures (including, without limitation, *in camera* review of protected information, sealing of portions of transcripts containing or discussing confidential information and/or excluding persons from the courtroom who are not described in Paragraph 8, 9 or 10 when protected information is shown or discussed) governing the disclosure of protected information at any hearing or trial in this case.

**E. OTHER PROCEDURES**

15. If a party believes that another party or protected person has designated material as "BUSINESS SENSITIVE" or "CONFIDENTIAL" that is not entitled to such protection, the party seeking disclosure shall make a good faith attempt to resolve the disagreement over the classification of the material with the protected person or party. If the parties and/or the protected person cannot resolve the matter, the party seeking disclosure has the burden to file a motion, notify all parties and affected protected persons of the filing of the motion, identify each document that is the subject of the motion (*e.g.*, by Bates-number or title, author, recipient and date) and submit the matter to the Court for resolution. In the event that a motion is filed challenging a confidentiality designation, the person designating the material shall respond within the time-period allowed for opposition to the motion. Failure to respond shall constitute a waiver of opposition to the motion.

16. This Order shall be without prejudice to the right of any party to bring before the Court the question of whether any particular information designated "BUSINESS

SF 21532341 3/2023550-0000300737

SENSITIVE" or "CONFIDENTIAL" is appropriately designated, or whether any particular information designated "BUSINESS SENSITIVE" or "CONFIDENTIAL" is or is not discoverable or admissible evidence at any hearing or trial of this action. Nothing in this Order shall be construed to effect an abrogation, waiver or limitation of any kind on the right of the parties or protected persons to assert any applicable discovery or trial privilege. No party concedes by complying with this Order that any information designated by any party or protected person as protected information is in fact confidential as that term is defined in Paragraph 1(a) of this Order. However, no information designated as "BUSINESS SENSITIVE" or "CONFIDENTIAL" pursuant to this Order shall be disclosed except as provided herein unless and until the Court orders the release of such information from the confidentiality provisions of this Order.

17. Any production of information without its being designated as "BUSINESS SENSITIVE" or "CONFIDENTIAL" shall not thereby be deemed a waiver of any claim of confidentiality as to such information, and the same may thereafter be designated "BUSINESS SENSITIVE" or "CONFIDENTIAL". Upon receiving notice from a party or protected person that protected information has not been appropriately so denominated, all such information shall be redenominated and treated appropriately. Any such subsequent designation, however, shall not apply retroactively to any previously disclosed information for which disclosure was proper when made.

18. This Order shall not apply to information in the public domain or obtained from other sources regardless of whether such information is also contained in materials designated as confidential pursuant to this Order.

19. Upon entry of this Order, the parties shall provide notice and a copy of this Order to all protected persons who provided them documents or information in this action prior to entry of this Order.

20. The parties, in conducting discovery from non-parties, shall attach to such discovery requests a copy of this Order so as to appraise such non-parties of their rights.

SF:21532341.3/2023550-0000300737

## F. PROCEDURES UPON TERMINATION OF LITIGATION

21.    Within 90 days after receiving notice of the entry of an order, judgment or decree terminating this action, all persons having received protected information shall, at the election of the party or protected person who produced the information, either return such material containing such information and all copies thereof to counsel for the party or protected person that produced it, or destroy all such material and certify that fact in writing. The plaintiffs and their counsel and outside counsel for any defendant shall be entitled to retain court papers, deposition and trial transcripts and exhibits, and attorney-work product (including discovery material containing protected information), provided that plaintiffs' employees, and defendants' outside counsel, and employees of such outside counsel shall not disclose the portions of court papers, deposition transcripts, exhibits or attorney-work product containing protected information to any person except pursuant to court order, or agreement with the party or protected person that produced the protected information. All protected information returned to the parties or their counsel by the Court likewise shall be disposed of in accordance with this Paragraph. Nothing in this provision, however, shall restrict the rights of the plaintiffs to retain and use protected information for law enforcement purposes or as otherwise required by law.

## G. RIGHT TO SEEK MODIFICATION

22.    The parties reserve the right to apply to the Court for any order modifying this Order or seeking further protections against discovery or other use of protected information. Any protected person requiring further confidentiality protection than is provided by this Order may petition the Court for a separate order governing disclosure of its confidential material.

23.    All hearings in this action, including the trial, will presumptively be open to the public, except that this Court will issue further orders as necessary to protect any protected person's or party's protected information from improper disclosure.

12

FOR PLAINTIFF UNITED STATES:

_David E. Blake-Thomas_ (signature)

David E. Blake-Thomas, Esq.
Antitrust Division
U.S. Department of Justice
Computers & Finance Section
600 E Street, N.W., Suite 9500
Washington, D.C. 20530

FOR DEFENDANT FIRST DATA:

_Christopher B. Hockett_ (signature)

Geraldine M. Alexis, *pro hac vice*
Christopher B. Hockett, *pro hac vice*
Frank M. Hinman, *pro hac vice*
BINGHAM MCCUTCHEN LLP
THREE EMBARCADERO CENTER
SAN FRANCISCO, CA 94111-4067
Telephone: 415.393.2000

Gerard Finn, DC Bar No. 448462
BINGHAM MCCUTCHEN LLP
1120 20TH STREET NW, SUITE 800
WASHINGTON, D.C. 20036
Telephone: 202.778.6155

FOR PLAINTIFF STATES:

_Rebecca Fisher_ (signature)

Rebecca Fisher, Esq.
Assistant Attorney General
P.O. Box 12548
Austin, TX 78711-2548

FOR DEFENDANT CONCORD EFS:

_Stephen R. Patton_ (signature)

Stephen R. Patton, *pro hac vice*
James H. Mutchnik, *pro hac vice*
KIRKLAND & ELLIS, LLP
200 E. RANDOLPH
CHICAGO, IL 60601
Telephone: 312.861.2000

Mark L. Kovner, DC Bar No. 430431
KIRKLAND & ELLIS, LLP
655 FIFTEENTH STREET, N.W.
WASHINGTON, D.C. 20005-5793
Telephone: 202.879.5000

IT IS SO ORDERED.

Dated: November __, 2003

_____
UNITED STATES DISTRICT JUDGE

SF:21532341.3/2023550-0000300737

# APPENDIX A

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, *et al.*,

        Plaintiffs,

        v.

FIRST DATA CORPORATION and CONCORD
EFS, INC.,

        Defendants.

Civil Action No. 1:03CV02169 (RMC)

Filed: October 23, 2003

## AGREEMENT CONCERNING CONFIDENTIALITY

I,_____, am employed as a _____ by
_____. I hereby certify that:

1. I have read the Protective Order entered in the above-captioned action, and understand its terms.

2. I agree to be bound by the terms of the Protective Order entered in the above-captioned action. I agree to use the information provided to me only for the purposes of this litigation.

3. I understand that my failure to abide by the terms of the Protective Order entered in the above-captioned action will subject me, without limitation, to civil and criminal penalties for contempt of Court.

4. I submit to the jurisdiction of the United States District Court for the District of Columbia solely for the purpose of enforcing the terms of the Protective Order entered in the above-captioned action and freely and knowingly waive any right I may otherwise have to object to the jurisdiction of said Court.

5. I make this certificate this _____ day of _____, 2003.

14

SF:21532341.3/2023550-0000300737

_____
(SIGNATURE)

SF:21532341 3/2023550-0000300737

## CERTIFICATE OF SERVICE

I hereby certify that copies of the JOINT MOTION FOR ENTRY OF PROPOSED

PROTECTIVE ORDER were served by e-mail this 5th day of November, 2003, upon each of the

parties listed below:

Counsel for Defendant First Data Corporation:

Christopher Hockett, Esq.
Bingham McCutchen LLP
Three Embarcadero Center
San Francisco, CA 94111
e-mail: chris.hockett@bingham.com

Larry Fullerton
Sidley Austin Brown & Wood LLP
1501 K Street, N.W.
Washington, D.C. 20005
e-mail: lfullerton@sidley.com

Jeffrey T. Green
Sidley Austin Brown & Wood LLP
1501 K Street, N.W.
Washington, D.C. 20005
e-mail: jgreen@sidley.com

Counsel for Defendant Concord EFS, Inc.:

Stephen R. Patton, Esq.
Kirkland & Ellis LLP
Aon Center
200 East Randolph Drive
Chicago, IL 60601-6636

Counsel for Plaintiff States:

Rebecca Fisher, Esq.                    Aaron Hoag
Assistant Attorney General              U.S. Department of Justice
P.O. Box 12548                          Antitrust Division
Austin, TX 78711-2548                   Networks & Technology Enforcement Section
                                        600 E Street, NW Suite 9500
                                        Washington, DC 20530
                                        (202) 307-6200

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA
United States Department of Justice
Antitrust Division
600 E Street, NW, Suite 9500
Washington, DC 20530,

CASE NUMBER 1:03CV02169

JUDGE: Rosemary M. Collyer

DECK TYPE: Antitrust

DATE STAMP: 10/23/2003

STATE OF CONNECTICUT
Office of the Attorney General
55 Elm Street
Hartford, CT 06106,

STATE OF ILLINOIS
Office of the Illinois Attorney General
100 W. Randolph Street, 13th Floor
Chicago, IL 60601,

STATE OF LOUISIANA
Department of Justice
301 Main Street, Suite 1250
Baton Rouge, LA 70801,

COMMONWEALTH OF
MASSACHUSETTS
Office of the Attorney General
One Ashburton Place
Boston, MA 02108,

STATE OF NEW YORK
Office of the Attorney General
120 Broadway, Room 26C62
New York, NY 10271,

STATE OF OHIO
Attorney General's Office
150 E. Gay Street
Colombus, OH 43215,

STATE OF TEXAS
Office of the Attorney General
P.O. Box 12548
Austin, TX 78711,



EXHIBIT

C

and

DISTRICT OF COLUMBIA
Office of the Corporation Counsel
441 4th Street, N.W., Suite 450-N
Washington, DC 20001,

                                  *Plaintiffs*,

                    v.

FIRST DATA CORPORATION
6200 South Quebec Street
Greenwood Village, CO 80111,

and

CONCORD EFS, INC.
2525 Horizon Lake Drive
Memphis, TN 38133,

                                  *Defendants*.

---

## VERIFIED COMPLAINT

The United States of America, acting under the direction of the Attorney General of the

United States, and the states of Connecticut, Illinois, Louisiana, Massachusetts, New York, Ohio,

and Texas and the District of Columbia ("Plaintiff States"), acting under the direction of their

respective Attorneys General, or other authorized officials, bring this civil action to enjoin the

proposed merger of First Data Corporation ("First Data") and Concord EFS, Inc. ("Concord"),

and allege as follows:

1.      First Data's acquisition of Concord would combine the largest and third-largest

point-of-sale ("POS") PIN debit networks in the United States. POS PIN debit networks are the

-2-

telecommunications and payment infrastructure that connects merchants to consumers' demand deposit accounts at banks. These networks enable consumers to purchase goods and services from merchants through PIN debit transactions by swiping their bank card at a merchant's terminal and entering a Personal Identification Number, or PIN. Within seconds, the purchase amount is debited from the customer's bank account and transferred to the retailer's bank.

2. PIN debit networks provide an increasingly important method of payment for consumers and retailers because PIN debit is the least expensive, most efficient, and most secure form of card payment. In 2002, customers purchased more than $150 billion in goods and services using PIN debit networks. PIN debit transaction volume has grown by more than 20 percent annually over the past 5 years. Today, merchants accept PIN debit transactions at more than one million retail locations in the United States.

3. Concord operates STAR, the nation's largest PIN debit network. STAR currently handles approximately half of all PIN debit transactions in the United States. First Data owns a controlling interest in NYCE, the nation's third-largest PIN debit network.

4. PIN debit networks compete for merchants to accept and route purchases over their networks. A significant number of banks that issue debit cards participate in more than one PIN debit network. In some cases, this allows merchants to choose the network over which to route a transaction; merchants make this choice based on a variety of factors, including price and network performance. Large merchants usually accept the debit cards of many PIN debit networks.

5. First Data's acquisition of Concord would substantially reduce competition among the PIN debit networks for retail transactions, in violation of Section 7 of the Clayton Act, 15

-3-

U.S.C. § 18. The merger would make prices for PIN debit network services to merchants less competitive. Merchants will pass on at least some of the higher costs of PIN debit transactions by raising the prices of their goods and services, to the detriment of tens of millions of consumers throughout the United States. The United States and Plaintiff States therefore seek an order permanently enjoining the merger.

## I. JURISDICTION AND VENUE

6.     This action is filed by the United States under Section 15 of the Clayton Act, 15 U.S.C. § 25, to prevent and restrain the Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

7.     The Plaintiff States bring this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain the Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18. The Plaintiff States, by and through their respective Attorneys General, or other authorized officials, bring this action in their sovereign capacities and as parens patriae on behalf of the citizens, general welfare, and economy of each of their states.

8.     First Data and Concord are engaged in interstate commerce and in activities substantially affecting interstate commerce. First Data and Concord provide PIN debit network services throughout the United States. First Data's and Concord's PIN debit networks are engaged in a regular, continuous, and substantial flow of interstate commerce, and have had a substantial effect upon interstate commerce as well as commerce in each of the Plaintiff States. The Court has jurisdiction over this action pursuant to Sections 12 and 15 of the Clayton Act, 15 U.S.C. §§ 22, 25, and 28 U.S.C. §§ 1331, 1337.

9.     First Data and Concord transact business and are found in the District of Columbia.

-4-

Venue is proper under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(c).

## II. THE DEFENDANTS AND THE TRANSACTION

10.  First Data is a corporation organized and existing under the laws of Delaware.  In

2002, First Data reported total worldwide revenues of $7.6 billion.  First Data is organized into

four business groups:  merchant services, payment services, card issuer services, and emerging

payments.  First Data's card issuing business offers a comprehensive set of services to banks that

issue debit and credit cards.  First Data's payment services group includes Western Union, the

leading provider of consumer-to-consumer money transfer services.

11.  First Data's merchant services segment, which primarily consists of NYCE and the

merchant processing and acquiring business, was responsible for $2.8 billion of the company's

revenues in 2002.  First Data owns 64 percent of NYCE Corporation, which operates the NYCE

PIN debit and ATM network.  Four large banks own the remaining 36 percent of NYCE

Corporation.  In addition, First Data is the nation's leading merchant processor.  A merchant

processor connects merchants to the various payment networks, ensuring that each transaction is

sent to the appropriate network.  First Data also acts as a merchant acquirer; merchant acquirers

sponsor merchants into the PIN debit networks, facilitate settlement, and assume financial

responsibility for the transactions.  First Data provides merchant processing and acquiring

services independently and through a series of alliances and partnerships with major financial

institutions.

12.  Concord is a corporation organized and existing under the laws of the state of

Delaware.  Concord's revenues in 2002 totaled nearly $2 billion.  Concord operates STAR, the

largest PIN debit and ATM network.  The STAR network is the result of a series of acquisitions

-5-

of other large networks over the past several years. Concord bought MAC in 1999 and Cash Station in 2000. Concord then acquired STAR in 2001; STAR itself had acquired the Honor network, which in turn had acquired MOST. Concord is also a leading merchant processor and acquirer and provides an array of services to debit card issuers and ATM owners.

13. On April 1, 2003, First Data and Concord entered into an Agreement and Plan of Merger, pursuant to which First Data will acquire Concord in an all-stock transaction valued at approximately $7 billion.

## III. THE RELEVANT MARKET

A.  *Description of the Product*

14. In the late 1970s, bank consortiums formed numerous regional electronic funds transfer ("EFT") networks to enable their customers to withdraw funds from ATMs owned by a variety of different banks. The EFT networks were first used to handle PIN debit purchases at retailers in the early 1980s. It was not until the mid-1990s, however, that PIN debit became a popular method of payment for consumers to purchase goods and services at retail stores. PIN debit transaction volume has grown substantially over the past five years due to merchant and consumer recognition of the advantages of PIN debit as a form of payment. Today, over 500 million PIN debit transactions are made every month. Nearly three-quarters of all PIN debit purchases occur at thirty large retail chains.

15. Many EFT networks, including those operated by First Data and Concord, route both ATM and PIN debit transactions. Some companies, however, operate separate ATM and PIN debit networks. For example, while Interlink is Visa's PIN debit network, Visa operates a separate ATM network called Plus.

-6-

16. A PIN debit network serves as the critical electronic switch connecting a network's participating financial institutions with merchants that accept the network. PIN debit networks provide one of the primary means for consumers to access the money in their checking accounts. A PIN debit network also performs a number of related functions necessary for the efficient operation of the network. For example, PIN debit networks: promote their brand names among consumers, merchants, and banks; establish rules and standards to govern their networks; and set fees and assessments for use of the network's products and services. Collectively, these products and services are "PIN debit network services."

17. To execute a PIN debit transaction, a customer swipes a debit card at a POS terminal and enters a PIN on a numeric keypad. After the PIN is entered, the POS terminal transmits the transaction and bank card information to a "merchant processor," which acts as a conduit between the merchant and the various PIN debit networks. The merchant processor sends the information to the appropriate PIN debit network, which switches the transaction to the issuing bank's "card processor." The card processor accesses the bank's account database to verify the PIN and ensure that the customer has sufficient funds to pay for the purchase. The card processor sends an electronic message to the PIN debit network accepting or rejecting the transaction. The PIN debit network switches this reply back to the merchant through the merchant processor to complete the transaction. The entire authorization process takes place electronically in just seconds. At the same time, the merchant acquirer "purchases" the transaction from the merchant, guaranteeing payment and facilitating settlement of the transaction.

18. A transaction can only be routed over a particular PIN debit network if the

-7-

customer's bank issues a debit card that participates in that network. This participation is signified by placing the network's logo, or "bug," on the card. To provide their customers with seamless access to the widest array of merchants, a significant number of banks place the bug of more than one PIN debit network on their cards. Many networks, including NYCE, have a "priority routing" rule that allows the card issuer to designate which PIN debit network will serve as the primary network for PIN debit transactions when the bank bugs its cards with two or more networks. STAR, by contrast, imposes a network routing rule, requiring most transactions on cards bearing the STAR bug to be routed over the STAR network, regardless of whether there are other bugs on the card.

19.   PIN debit networks charge both the merchant and the card-issuing bank a "switch" fee for the network switching services provided by the network. This fee typically ranges from 2 cents to 4 cents per transaction. The PIN debit networks also set an "interchange" fee, which is a fee paid by the merchant to the PIN debit network. The PIN debit network then passes through the interchange fee to the card-issuing bank as compensation for permitting access to the consumer's bank account. The interchange fee is normally at least 4-5 times as large as the switch fee, ranging from as low as 10 cents to as high as 45 cents, depending on the network, the merchant, and the size of the transaction. Consequently, the merchant's total charge for each PIN debit transaction is the interchange fee plus the switch fee.

20.   At some networks, such as NYCE and Interlink, an advisory board representing the network's bank members has substantial authority over setting the network's interchange rates and determining the network's rules, including rules concerning the routing of PIN debit transactions.

-8-

21.  The PIN debit network services market is characterized by significant network effects.  Financial institutions are more likely to join networks that are accepted by many merchants.  Conversely, merchants are more likely to accept networks that have many large financial institutions as members because the value of a particular PIN debit network depends in great measure on the breadth of its acceptance and use.

22.  Many debit cards can also execute "signature" debit transactions, in addition to PIN debit transactions.  Signature debit transactions are authenticated like credit card transactions, with the customer signing for identification rather than entering a PIN.  Visa and MasterCard developed the only two signature debit networks from their existing credit card infrastructure.  In contrast to a PIN debit transaction, in which the funds are immediately transferred from the customer's account, a signature debit transaction generally takes twenty-four to forty-eight hours to settle.

23.  PIN debit networks offer a number of substantial advantages to consumers and merchants that distinguish them from signature debit networks.  PIN debit networks are generally considerably less expensive to merchants than signature debit networks, due to significantly lower interchange rates.  PIN debit networks also provide a more secure method of payment than signature debit because it is much easier to forge a person's signature than to obtain an individual's PIN; consequently, fraud rates for PIN debit are substantially lower than for signature debit.  Because of the increased security of PIN debit, there is no need for the complicated and expensive charge-back procedures that allow consumers to challenge signature debit transactions, thereby saving merchants additional time and money.  PIN debit transactions also settle instantaneously, guaranteeing the merchant ready access to its receipts, whereas

-9-

signature debit transactions usually take a day or two to settle. Finally, PIN debit networks allow for faster execution than signature debit networks. With a PIN debit transaction, customers can enter their PIN as soon as the first product is scanned. By contrast, customers cannot sign for signature debit transactions until after the entire order is totaled, prolonging the checkout process.

24. PIN debit networks also allow individuals to receive cash back at the register when making a purchase, a popular feature with many consumers. Customers cannot receive cash back when making a signature debit purchase. Today, customers request cash back in approximately 20 percent of all PIN debit transactions. Customers also value the additional security provided by PIN verification as opposed to signature.

B. *Relevant Product Market*

25. The relevant product market affected by this transaction is the provision of PIN debit network services. A hypothetical monopolist could profitably impose a small but significant and nontransitory increase in the price of all PIN debit network services.

26. Signature debit networks are not in the same product market as PIN debit networks because signature debit networks are substantially more expensive and have inferior functionality and features. PIN debit networks would remain substantially less expensive than signature debit or credit card networks even after a small but significant nontransitory increase in price. Merchants would continue to purchase and promote the use of PIN debit network services because of the low fraud rate, corresponding lack of charge-backs, speed of execution at the register, and the cash back feature that many customers demand. As the President of First Data Merchant Services testified, PIN debit "is still the lowest-cost, most efficient, most secure transaction there is out there in electronic transactions."

-10-

27. Merchants would not defeat a small but significant and nontransitory increase in the price of PIN debit network services by requiring or encouraging their customers to switch from PIN debit to signature debit or other payment methods.

28. The provision of PIN debit network services is a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18.

C.    *Relevant Geographic Market*

29. First Data and Concord compete with each other throughout the United States. Merchants in the United States could not switch to providers of PIN debit network services located outside of the United States in the event of a small but significant nontransitory increase in the price by PIN debit networks in the United States. While certain networks are stronger in particular areas of the country, the largest networks essentially operate on a national scale. Accordingly, the United States is a relevant geographic market within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18.

## IV. MARKET CONCENTRATION

30. The relevant market is highly concentrated and would become significantly more concentrated as a result of the proposed transaction. As of March 2003, the most recent period for which data is available, Concord accounted for approximately 56 percent of PIN debit transactions, while First Data had approximately a 10 percent share. The top four networks — STAR, Visa's Interlink, NYCE, and Pulse — routed over 90 percent of all PIN debit transactions. Using a standard measure of market concentration called the "HHI" (defined and explained in Appendix A), the market is highly concentrated, with a pre-merger HHI of approximately 3590. First Data's acquisition of Concord would increase the HHI by

-11-

approximately 1120, resulting in a post-merger HHI of approximately 4710. While STAR has

recently lost some significant bank contracts to Interlink and NYCE, under even the most

conservative estimate of future market shares the combined firm would have approximately a 45

percent post-merger share. Taking into account these lost contracts, the PIN debit network

services market remains highly concentrated and would become substantially more concentrated

as a result of the merger, with a post-merger HHI greater than 3000.

## V. ANTICOMPETITIVE EFFECTS

A.  *The Proposed Transaction Will Likely Substantially Reduce Competition Among PIN*
    *Debit Networks*

31.  First Data's acquisition of Concord will combine the largest and third-largest PIN

debit networks and enable the resulting network to raise prices and to reduce levels of service to

merchants.

32.  PIN debit networks compete for merchant business by attempting to convince

merchants to accept their networks and to route to their networks when there is a choice of

routing options. PIN debit networks also compete for merchants by improving their networks'

transmission speed, limiting network down-time, and reducing the number of improperly rejected

transactions. Merchants' ability to choose which networks to accept at their stores and their

control over the routing of some transactions acts as a constraint on the price of PIN debit

network services to merchants.

33.  While most large merchants generally accept all of the PIN debit networks, retailers

can and have used the threat of dropping a network to obtain lower prices. For example, in 2001

Visa announced a substantial rate increase for its PIN debit network, Interlink; STAR, and later

-12-

NYCE, followed by announcing comparable price increases. A number of large retailers responded by stating that if Interlink implemented the planned price increase, they would no longer accept Interlink. In response, Interlink delayed and substantially scaled back its proposed price increase. Then STAR delayed and reduced its planned price increase to remain competitive. Similarly, NYCE concluded in an internal document that its "previously announced pricing [was] now out of balance with new market realities" and followed suit.

34. Combining STAR and NYCE will make it substantially more difficult for merchants to use the possibility of dropping a network to prevent price increases. The larger the network, the more risky it is for a merchant to drop that network because of the increased likelihood of rejected transactions, delays at check-out lines, customer confusion and backlash, lost sales, and customer use of other forms of payment that are more costly to the merchant.

35. The PIN debit networks take into account the merchants' competitive reactions when they make decisions about pricing. Earlier this year, NYCE was considering raising interchange rates to attract financial institutions to the network. NYCE's internal analysis of the market recognized, however, that "[t]aking a leadership role in POS interchange does not come without risk to the transaction growth engine of the NYCE Network and its current revenue stream . . . . *[P]recedent has been set via major retailers in the past dropping or threatening to drop a payment card network due to pricing. . . . [T]he risks are material that certain retailers or segments may decide to 'send a message' and simply stop taking NYCE-branded cards for purchases.*" (emphasis added)

36. First Data's acquisition of Concord will also reduce competition in the PIN debit market by limiting merchants' ability to route transactions to the least-cost network. Major

-13-

supermarkets and mass merchandisers have obtained superior prices and levels of service by routing, or threatening to route, transactions away from NYCE to STAR and vice versa. After the merger, merchants will no longer be able to seek lower prices and improved service from the combined firm by playing off NYCE and STAR against each other in this manner.

37. An internal merger planning document acknowledged the likely effect of First Data's acquisition of Concord on pricing in the PIN debit network services market: the "[c]ombination of NYCE and Star allows FDC [First Data Corp.] more leeway to set market pricing."

38. Interchange fees have risen dramatically in the past several years as the PIN debit network services market has become more highly concentrated. First Data's acquisition of Concord will likely exacerbate this trend toward higher pricing by further reducing competition in the market. Merchants will be forced to pass on a significant portion of the higher fees to tens of millions of consumers, in the form of higher prices for all goods and services. Merchants do not typically pass through increase costs for particular forms of payment on a per-transaction basis.

39. Any efforts the combined First Data/Concord might make to expand PIN debit usage after the merger would not prevent the company from raising prices to merchants that already accept PIN debit. PIN debit networks are able to charge different prices to merchants based on the value of the network to the particular company or type of merchant. For example, First Data and Concord have both recently offered substantial discounts to quick-service restaurants to encourage them deploy PIN pads at all of their locations. At the same time, First Data and Concord have dramatically raised their merchant fees to the market as a whole. This ability to engage in price discrimination will facilitate First Data's exercise of market power post-merger

-14-

by allowing it to simultaneously raise prices to merchants that already accept PIN pads and cut special deals to attract new market segments to the network.

B.    *Lack of Countervailing Factors*

40.    It is unlikely that entry or expansion in the PIN debit network services market will occur in a timely manner or on a scale sufficient to undo the competitive harm that the merger will produce. Entry and expansion are difficult because they require large, sunk investments to attract bank members, and, to a lesser degree, participating merchants. Coordinated development of both bank members and merchant acceptance is critical because the utility of a particular PIN debit network to customers, banks, and merchants depends not only on the cost and features of the card, but also on the breadth of its acceptance and use. These network effects that characterize the PIN debit network services market make it difficult for small networks to significantly expand their market share.

41.    Banks would have little incentive to join a new or small network that was attempting to expand market share by offering lower interchange rates to merchants. To the contrary, a bank would only have an incentive to join a network if it offered higher interchange rates. Without such bank participation, a network's attempts to expand would prove fruitless. Moreover, financial institutions benefit from a market structure characterized by a limited number of significant PIN debit networks and face fewer competitive constraints to setting higher prices to merchants.

42.    The PIN debit networks have adopted rules and policies that further increase the cost for a network to expand by developing bank and merchant participation. For example, the networks' priority routing rules make entry more difficult and less likely. Even if a network

-15-

succeeds in convincing banks to add its bug to the banks' debit cards, the network is unlikely to see many transactions because of the priority routing rules. In addition, STAR requires its member banks to use STAR for both ATM and PIN debit network services; this all-or-nothing requirement makes it more difficult for competing networks to convince banks to participate in their network. Finally, banks that want to act as acquirers for STAR ATM and PIN debit transactions must issue cards that participate in the STAR network. Because a significant number of banks have substantial ATM or merchant acquiring businesses, the STAR rule further inhibits potential expansion by competing PIN debit networks. After the merger, the application of any or all of these rules to First Data/Concord's combined network would inhibit entry or expansion by other PIN debit networks.

43. Finally, the combination of First Data's and Concord's merchant processing businesses with their PIN debit networks will raise barriers to entry. The combined First Data/Concord will process more than half of all PIN debit transactions. As the merchant processor, the merged firm will have significant control over which network routes a transaction on a double-bugged card. As the owner of the dominant PIN debit network, First Data will have a significant incentive to exercise this control after it acquires Concord, inhibiting other PIN debit networks from expanding their presence in the market.

## VI. VIOLATION ALLEGED

44. The United States and the Plaintiff States hereby incorporate paragraphs 1 through 43.

45. First Data's acquisition of Concord would likely substantially lessen competition in the provision of PIN debit network services, in violation of Section 7 of the Clayton Act, 15

-16-

U.S.C. § 18. The transaction would likely have the following effects, among others:

(a)  competition between First Data and Concord in the provision of PIN debit network services would be eliminated;

(b)  competition generally in the provision of PIN debit network services would be eliminated or substantially lessened;

(c)  prices of PIN debit network services to merchants that currently use them would likely increase to levels above those that would prevail absent the merger, forcing merchants to pass on these increased costs in the form of higher prices for all goods and services to tens of millions of consumers; and

(d)  quality in the provision of PIN debit network services would likely decrease to levels below those that would prevail absent the merger.

## REQUEST FOR RELIEF

46.  The United States and the Plaintiff States request:

(a)  that the proposed acquisition be adjudged to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

(b)  that the Defendants be permanently enjoined and restrained from carrying out the Agreement and Plan of Merger dated April 1, 2003, or from entering into or carrying out any agreement, understanding, or plan by which First Data would merge with or acquire Concord, its capital stock, or any of its assets;

(c)  that the United States and the Plaintiff States be awarded costs of this action;

(d)  that as the Court may deem appropriate, the Plaintiff States be awarded reasonable attorneys fees and costs as permitted by law; and

-17-

(e) that the United States and the Plaintiff States have such other relief as the Court may deem just and proper.

Respectfully submitted,

FOR PLAINTIFF UNITED STATES:

_R. Hewitt Pate_
R. Hewitt Pate
Assistant Attorney General
(D.C. Bar No. 473598)

_Deborah P. Majoras_
Deborah P. Majoras
Deputy Assistant Attorney General
(D.C. Bar No. 474239)

_J. Robert Kramer, II_
J. Robert Kramer, II
Director of Operations

_Renata B. Hesse_
Renata B. Hesse, Chief
 (Calif. Bar No. 148425)
N. Scott Sacks, Assistant Chief
 (D.C. Bar No. 913087)
Networks & Technology Enforcement Section

_Joshua H. Soven_
Joshua H. Soven
(D.C. Bar No. 436633)

_Craig W. Conrath_
Craig W. Conrath*
 (Minnesota Bar No. 18569)

Trial Attorneys
U.S. Department of Justice
Antitrust Division
Networks & Technology Enforcement Section
600 E Street, NW Suite 9500
Washington, DC 20530
(202) 307-6200

*Counsel of Record

DATED: October 23 , 2003

FOR PLAINTIFF STATE OF CONNECTICUT

RICHARD BLUMENTHAL
ATTORNEY GENERAL

Steven M. Rutstein
Assistant Attorney General
Department Head/Antitrust Department
Federal Bar No. ct09086


*Rachel O. Davis*

Rachel O. Davis
Assistant Attorney General
Antitrust Department
Federal Bar No. ct07411
DC Bar No. 413157 (inactive)


55 Elm Street
Hartford, Connecticut 06106
Tel: (860) 808-5040
Fax: (860) 808-5033

FOR PLAINTIFF STATE OF ILLINOIS
LISA MADIGAN
Attorney General

_Robert N. Pratt_

Robert W. Pratt
IL ARDC NO. 2247593
Chief, Antitrust Bureau

Livia S. West
IL ARDC NO. 6276883
Assistant Attorney General
Office of the Illinois Attorney General
100 W. Randolph Street, 13th Floor
Chicago, IL 60601
Tel: 312-814-6021
Fax: 312-814-1154



RICHARD P. IEYOUB
ATTORNEY GENERAL

## State of Louisiana
DEPARTMENT OF JUSTICE
PUBLIC PROTECTION DIVISION
Baton Rouge
70825

ONE AMERICAN PLACE
301 MAIN ST. SUITE 1250
TELEPHONE (225) 342-7900
FAX (225) 342-7901

October 20, 2003

Louisiana's Signature Page for the FDC/Concord merger opposition case

Attorney General
Richard P. Ieyoub

BY:  *Jane Bishop Johnson*

Jane Bishop Johnson, #21651
Louisiana Department of Justice
301 Main Street, Suite 1250
Baton Rouge, LA 70801
(225) 342-2754
(225) 342-9637 (FAX)

FOR THE PLAINTIFF, THE COMMONWEALTH OF MASSACHUSETTS

THOMAS F. REILLY
ATTORNEY GENERAL

Betsy S. Whittey, BBO# 645593
Assistant Attorney General
Consumer Protection and Antitrust Division
One Ashburton Place
Boston, MA 02108
617-727-2200, ext. 2968
617-727-5765

FOR PLAINTIFF STATE OF NEW YORK:

OFFICE OF THE ATTORNEY GENERAL
By:

Jay L. Himes
Chief, Antitrust Bureau
N.Y. Attorney No. 1236934

Richard E. Grimm
Assistant Attorney General
N.Y. Attorney No. 1337138

Antitrust Bureau
Office of the Attorney General
120 Broadway, Room 26C62
New York, New York 10271-0332
Tel: (212) 416-8282, (212) 416-8280
Fax: (212) 416-6015

United States of America, et al. (State of Ohio) v. First Data Corporation and Concord EFS, Inc.

For Plaintiff State of Ohio

JIM PETRO
Attorney General
State of Ohio


MITCHELL L. GENTILE
OH Bar Number 0022274
Principal Attorney
Antitrust Section
Ohio Attorney General's Office
150 E. Gay Street
Columbus, OH 43215-3031
Tel: 614-466-4328
Fax: 614-995-0266

FOR PLAINTIFF STATE OF TEXAS

GREG ABBOTT
Attorney General of Texas

BARRY R. McBEE
First Assistant Attorney General

EDWARD D. BURBACH
Deputy Attorney General for Litigation

MARK TOBEY
Assistant Attorney General
Chief, Antitrust Division

*Rebecca Fisher by AR*

REBECCA FISHER
Assistant Attorney General
State Bar No. 07057800

Office of the Attorney General
P. O. Box 12548
Austin, Texas 78711-2548
512/463-2185
512/320-0975 (Facsimile)

Signature by the State of Texas of Complaint in
*United States of America, et al., v. First Data Corporation*
*and Concord EFS, Inc.*

ROBERT J. SPAGNOLETTI
Corporation Counsel, D.C.

_Charlotte W. Parker_

CHARLOTTE W. PARKER   (Bar #186205)
Deputy Corporation Counsel
Civil Division

_Don Allen Resnikoff_

BENNETT RUSHKOFF   (Bar # 386925)
Senior Counsel
DON ALLEN RESNIKOFF   (Bar # 386688)
Assistant Corporation Counsel
ANIKA SANDERS COOPER (Bar # 458863)
Assistant Corporation Counsel

Office of the Corporation Counsel
441 4th Street, N.W., Suite 450-N
Washington, D.C. 20001
(202) 727-4170

ATTORNEYS FOR THE DISTRICT OF COLUMBIA

## APPENDIX A
### Herfindahl-Hirschman Index

"HHI" means the Herfindahl-Hirschman Index, a commonly accepted measure of market concentration. It is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers. For example, for a market consisting of four firms with shares of 30%, 30%, 20%, and 20%, the HHI is 2600 ($30^2 + 30^2 + 20^2 + 20^2 = 2600$). (Note: Throughout the Complaint, market share percentages have been rounded to the nearest whole number, but HHIs have been estimated using unrounded percentages in order to accurately reflect the concentration of the various markets.) The HHI takes into account the relative size distribution of the firms in a market and approaches zero when a market consists of a large number of small firms. The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases.

Markets in which the HHI is between 1000 and 1800 points are considered to be moderately concentrated, and those in which the HHI is in excess of 1800 points are considered to be highly concentrated. *See Horizontal Merger Guidelines* ¶ 1.51 (revised Apr. 8, 1997). Transactions that increase the HHI by more than 100 points in concentrated markets presumptively raise antitrust concerns under the guidelines issued by the U.S. Department of Justice and Federal Trade Commission. *See id.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, et al. | |
| *Plaintiffs*, | |
| v. | CASE NUMBER: |
| FIRST DATA CORPORATION, | JUDGE: |
| and | FILED: |
| CONCORD EFS, INC., | |
| *Defendants.* | |

## VERIFICATION OF COMPLAINT

I, Joshua H. Soven, declare as follows:

1. I am one of the attorneys for the United States in this action. I have personal knowledge of the facts stated herein, and would be competent to testify to them if called upon to do so.

2. The Complaint filed herewith was prepared under the direction of the Attorney General of the United States. The facts stated therein have been assembled from documents, records and other information produced by the defendants herein, responses to administrative and compulsory process issued to the defendants and to various third parties, and from public sources, by myself and by authorized counsel, economists, and other employees of the United States Department of Justice working under my direction. The allegations contained in the Complaint are true and correct to the best of my knowledge, information, and belief.

3. No previous complaint have been filed for this cause of action.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 23rd

day of October, 2003 in Washington, D.C.

Joshua H. Soven
U.S. Department of Justice
Antitrust Division
600 E Street, N.W., Suite 9500
Washington, D.C. 20530
(202) 307-6200

-2-

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, *et al.*,

                *Plaintiffs*,

    v.

FIRST DATA CORPORATION and CONCORD EFS, INC.,

                *Defendants*.

Case No. 1:03CV02169 (RMC)

DEFENDANT FIRST DATA CORPORATION'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' VERIFIED COMPLAINT



EXHIBIT

D

Defendant First Data Corporation ("First Data"), by and through its attorneys, responds to the Complaint filed by the United States of America and Plaintiff States (collectively, "Plaintiffs") as follows. The Complaint reflects Plaintiffs' misunderstanding of the payments industry, its current competitive state, and the likely effect of the merger. First Data denies each and every allegation of the Complaint not specifically admitted below.

        1.      First Data's acquisition of Concord would combine the largest and third-largest point-of-sale ("POS") PIN debit networks in the United States. POS PIN debit networks are the telecommunications and payment infrastructure that connects merchants to consumers' demand deposit accounts at banks. These networks enable consumers to purchase goods and services from merchants through PIN debit transactions by swiping their bank card at a merchant's terminal and entering a Personal Identification Number, or PIN. Within seconds, the purchase amount is debited from the customer's bank account and transferred to the retailer's bank.

        **Response: First Data admits that the acquisition would combine two of the**

Case 3:03-mc-00143-GCM   Document 2   Filed 11/21/03   Page 86 of 113

**four currently largest POS PIN debit networks by transaction volume, and two of the six**

**largest POS debit networks (signature and PIN), but denies that POS PIN debit is a**

**relevant antitrust market, which includes at a minimum all other payment methods**

**capable of accessing customers' DDA accounts. First Data admits that POS PIN debit**

**networks allow merchant processors (and in a few cases merchants) to connect to**

**consumers' DDA accounts. First Data admits the third sentence of Paragraph 1. First**

**Data denies the remaining allegations contained in Paragraph 1.**

      2.     PIN debit networks provide an increasingly important method of payment

for consumers and retailers because PIN debit is the least expensive, most efficient, and most

secure form of card payment. In 2002, customers purchased more than $150 billion in goods and

services using PIN debit networks. PIN debit transaction volume has grown by more than 20

percent annually over the past 5 years. Today, merchants accept PIN debit transactions at more

than one million retail locations in the United States.

      **Response: First Data admits that PIN debit networks provide an important,**

**efficient and secure method of payment for consumers and retailers. First Data is without**

**sufficient knowledge to admit or deny the remaining allegations contained in Paragraph 2**

**and accordingly denies them.**

      3.     Concord operates STAR, the nation's largest PIN debit network. STAR

currently handles approximately half of all PIN debit transactions in the United States. First

Data owns a controlling interest in NYCE, the nation's third-largest PIN debit network.

      **Response: First Data admits that Concord operates STAR and that First**

**Data owns approximately a 64% interest in NYCE. First Data admits that, in the past,**

**STAR has handled approximately half of the PIN debit POS transactions in the United**

DEFENDANT FIRST DATA CORPORATION'S ANSWER AND AFFIRMATIVE DEFENSES

SF:21531017.3/2023550-0000300737

States, but denies that these figures represent Concord's expected share of PIN debit transactions in the future, as STAR's transaction share has dropped significantly in recent months while Visa Interlink's share has nearly doubled. First Data is without sufficient knowledge or information to admit or deny the remaining allegations contained in Paragraph 3 and, accordingly denies them.

4.    PIN debit networks compete for merchants to accept and route purchases over their networks. A significant number of banks that issue debit cards participate in more than one PIN debit network. In some cases, this allows merchants to choose the network over which to route a transaction; merchants make this choice based on a variety of factors, including price and network performance. Large merchants usually accept the debit cards of many PIN debit networks.

Response: First Data admits that many banks participate in more than one PIN debit network and that many merchants accept the debit cards of more than one PIN debit network. First Data is without sufficient information to admit or deny the remaining allegations contained in Paragraph 4 and accordingly denies them.

5.    First Data's acquisition of Concord would substantially reduce competition among the PIN debit networks for retail transactions, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. The merger would make prices for PIN debit network services to merchants less competitive. Merchants will pass on at least some of the higher costs of PIN debit transactions by raising the prices of their goods and services, to the detriment of tens of millions of consumers throughout the United States. The United States and Plaintiff States therefore seek an order permanently enjoining the merger.

Response: First Data admits that Plaintiffs purport to seek relief enjoining

**the merger. First Data denies the remaining allegations contained in Paragraph 5.**

## I. JURISDICTION AND VENUE

6.     This action is filed by the United States under Section 15 of the Clayton Act, 15 U.S.C. § 25, to prevent and restrain the Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

**Response:  First Data admits that the United States purports to bring this action pursuant to the referenced statutes.  First Data denies that the United States is entitled to any relief and denies the remaining allegations contained in Paragraph 6.**

7.     The Plaintiff States bring this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain the Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.  The Plaintiff States, by and through their respective Attorneys General, or other authorized officials, bring this action in their sovereign capacities and as parens patriae on behalf of the citizens, general welfare, and economy of each of their states.

**Response:  First Data admits that the Plaintiff States purport to bring this action pursuant to the referenced statutes.  First Data denies that the Plaintiff States are entitled to any relief and denies the remaining allegations contained in Paragraph 7.**

8.     First Data and Concord are engaged in interstate commerce and in activities substantially affecting interstate commerce.  First Data and Concord provide PIN debit network services throughout the United States.  First Data's and Concord's PIN debit networks are engaged in a regular, continuous, and substantial flow of interstate commerce, and have had a substantial effect upon interstate commerce as well as commerce in each of the Plaintiff States.  The Court has jurisdiction over this action pursuant to Sections 12 and 15 of the Clayton Act, 15 U.S.C. §§ 22, 25, and 28 U.S.C. §§ 1331, 1337.

DEFENDANT FIRST DATA CORPORATION'S ANSWER AND AFFIRMATIVE DEFENSES

4

SF:21531017.3/2023550-0000300737

**Response:  First Data states that its activities generally involve interstate commerce but denies that it provides PIN debit network services, although it admits that Concord and NYCE do.  First Data admits that the Court has jurisdiction over this action.  First Data is without sufficient knowledge or information to admit or deny the remaining allegations contained in Paragraph 8 and, accordingly denies them.**

9.     First Data and Concord transact business and are found in the District of Columbia.  Venue is proper under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(c).

**Response:  First Data admits the allegations of Paragraph 9.**

**II.  THE DEFENDANTS AND THE TRANSACTION**

10.    First Data is a corporation organized and existing under the laws of Delaware.  In 2002, First Data reported total worldwide revenues of $7.6 billion.  First Data is organized into four business groups: merchant services, payment services, card issuer services, and emerging payments.  First Data's card issuing business offers a comprehensive set of services to banks that issue debit and credit cards.  First Data's payment services group includes Western Union, the leading provider of consumer-to-consumer money transfer services.

**Response:  First Data admits that it is a corporation organized and existing under the laws of Delaware with four business groups:  merchant services, payment services, card issuer services, and emerging payments.  First Data admits that its card issuing business offers services to banks that issue debit and credit cards and that its payment services group includes Western Union, which provides consumer-to-consumer money transfer services.  First Data further admits that in its 2002 Annual Report, it reported total worldwide revenues of approximately $7.6 billion.  First Data denies the**

**remaining allegations contained in Paragraph 10.**

11. First Data's merchant services segment, which primarily consists of NYCE and the merchant processing and acquiring business, was responsible for $2.8 billion of the company's revenues in 2002. First Data owns 64 percent of NYCE Corporation, which operates the NYCE PIN debit and ATM network. Four large banks own the remaining 36 percent of NYCE Corporation. In addition, First Data is the nation's leading merchant processor. A merchant processor connects merchants to the various payment networks, ensuring that each transaction is sent to the appropriate network. First Data also acts as a merchant acquirer; merchant acquirers sponsor merchants into the PIN debit networks, facilitate settlement, and assume financial responsibility for the transactions. First Data provides merchant processing and acquiring services independently and through a series of alliances and partnerships with major financial institutions.

**Response: First Data admits that in its 2002 Annual Report, it reported revenues for its merchant services segment, which includes NYCE and the merchant processing and acquiring business, of approximately $2.76 billion. First Data further admits that it owns approximately 64% percent of NYCE Corporation, which operates the NYCE PIN debit and ATM network, and that HSBC, Citibank, Fleet Boston, and J.P. Morgan Chase own the remaining portion of NYCE Corporation. First Data admits that it is a merchant processor and a merchant acquirer and that it provides these services independently and through alliances and partnerships with financial institutions. First Data admits that Paragraph 11 describes in a limited fashion the roles of a merchant processor and a merchant acquirer, but states that merchant processors often provide services to merchant acquirers, not directly to merchants. First Data denies the remaining**

allegations contained in Paragraph 11.

12.    Concord is a corporation organized and existing under the laws of the state of Delaware.  Concord's revenues in 2002 totaled nearly $2 billion.  Concord operates STAR, the largest PIN debit and ATM network.  The STAR network is the result of a series of acquisitions of other large networks over the past several years.  Concord bought MAC in 1999 and Cash Station in 2000.  Concord then acquired STAR in 2001; STAR itself had acquired the Honor network, which in turn had acquired MOST.  Concord is also a leading merchant processor and acquirer and provides an array of services to debit card issuers and ATM owners.

**Response:  First Data admits that Concord operates STAR and that Concord and/or STAR have acquired or merged with other networks during the last several years. First Data is without sufficient knowledge or information to admit or deny the remaining allegations contained in Paragraph 12 and, accordingly denies them.**

13.    On April 1, 2003, First Data and Concord entered into an Agreement and Plan of Merger, pursuant to which First Data will acquire Concord in an all-stock transaction valued at approximately $7 billion.

**Response:  First Data admits that, on April 1, 2003, First Data and Concord entered into an Agreement and Plan of Merger, pursuant to which the two will merge in a strategic combination valued at approximately $7 billion.  First Data denies the remaining allegations contained in Paragraph 13.**

### III. THE RELEVANT MARKET

A.    *Description of the Product*

14.    In the late 1970s, bank consortiums formed numerous regional electronic funds transfer ("EFT") networks to enable their customers to withdraw funds from ATMs owned

Case 3:03-mc-00143-GCM   Document 2   Filed 11/21/03   Page 92 of 113

by a variety of different banks. The EFT networks were first used to handle PIN debit purchases at retailers in the early 1980s. It was not until the mid-1990s, however, that PIN debit became a popular method of payment for consumers to purchase goods and services at retail stores. PIN debit transaction volume has grown substantially over the past five years due to merchant and consumer recognition of the advantages of PIN debit as a form of payment. Today, over 500 million PIN debit transactions are made every month. Nearly three-quarters of all PIN debit purchases occur at thirty large retail chains.

**Response: First Data admits that in the late 1970s, bank consortiums formed numerous regional EFT networks to enable their customers to withdraw funds from ATMs owned by a variety of different banks. First Data admits that the EFT networks were first used to handle PIN debit purchases from retailers in the early 1980s, and that the use of PIN debit transactions at retailers has grown since. First Data is without sufficient knowledge or information to admit or deny the remaining allegations contained in Paragraph 14 and, accordingly denies them.**

15.   Many EFT networks, including those operated by First Data and Concord, route both ATM and PIN debit transactions. Some companies, however, operate separate ATM and PIN debit networks. For example, while Interlink is Visa's PIN debit network, Visa operates a separate ATM network called Plus.

**Response: First Data admits that NYCE and STAR route both ATM and PIN debit transactions and that some companies, such as Visa, may operate separate ATM and PIN debit networks. First Data is informed and believes that Interlink is Visa's PIN debit network and that Plus is Visa's ATM network. First Data is without sufficient knowledge to admit or deny the remaining allegations contained in Paragraph 15, and**

**accordingly denies them.**

16. A PIN debit network serves as the critical electronic switch connecting a network's participating financial institutions with merchants that accept the network. PIN debit networks provide one of the primary means for consumers to access the money in their checking accounts. A PIN debit network also performs a number of related functions necessary for the efficient operation of the network. For example, PIN debit networks: promote their brand names among consumers, merchants, and banks; establish rules and standards to govern their networks; and set fees and assessments for use of the network's products and services. Collectively, these products and services are "PIN debit network services."

**Response: First Data admits that PIN debit networks are one way, along with, for example, signature debit networks and paper and electronic checks, for a merchant or its processor to connect with a network's participating financial institutions and ultimately allow consumers to access money in their checking accounts to make purchases. First Data admits that PIN debit networks have rules and set fees relating to the use of the network's products and services. First Data denies the remaining allegations contained in Paragraph 16.**

17. To execute a PIN debit transaction, a customer swipes a debit card at a POS terminal and enters a PIN on a numeric keypad. After the PIN is entered, the POS terminal transmits the transaction and bank card information to a "merchant processor," which acts as a conduit between the merchant and the various PIN debit networks. The merchant processor sends the information to the appropriate PIN debit network, which switches the transaction to the issuing bank's "card processor." The card processor accesses the bank's account database to verify the PIN and ensure that the customer has sufficient funds to pay for the purchase. The

card processor sends an electronic message to the PIN debit network accepting or rejecting the transaction. The PIN debit network switches this reply back to the merchant through the merchant processor to complete the transaction. The entire authorization process takes place electronically in just seconds. At the same time, the merchant acquirer "purchases" the transaction from the merchant, guaranteeing payment and facilitating settlement of the transaction.

**Response: First Data admits that there are several ways to execute a PIN debit transaction and that Paragraph 17 generally describes in a limited and not completely accurate fashion, one such way. First Data denies the remaining allegations contained in Paragraph 17.**

18. A transaction can only be routed over a particular PIN debit network if the customer's bank issues a debit card that participates in that network. This participation is signified by placing the network's logo, or "bug," on the card. To provide their customers with seamless access to the widest array of merchants, a significant number of banks place the bug of more than one PIN debit network on their cards. Many networks, including NYCE, have a "priority routing" rule that allows the card issuer to designate which PIN debit network will serve as the primary network for PIN debit transactions when the bank bugs its cards with two or more networks. STAR, by contrast, imposes a network routing rule, requiring most transactions on cards bearing the STAR bug to be routed over the STAR network, regardless of whether there are other bugs on the card.

**Response: First Data admits that one way to signify an issuer's network participation is to place a "bug" on the bank's debit cards, and that many issuers place the bug of more than one PIN debit network on their cards. First Data admits that the NYCE**

**network has an "issuer routing" rule. First Data is without sufficient knowledge or information to admit or deny the allegations contained in the last sentence of Paragraph 18 and, accordingly denies them. First Data denies the remaining allegations contained in Paragraph 18.**

19.     PIN debit networks charge both the merchant and the card-issuing bank a "switch" fee for the network switching services provided by the network. This fee typically ranges from 2 cents to 4 cents per transaction. The PIN debit networks also set an "interchange" fee, which is a fee paid by the merchant to the PIN debit network. The PIN debit network then passes through the interchange fee to the card-issuing bank as compensation for permitting access to the consumer's bank account. The interchange fee is normally at least 4-5 times as large as the switch fee, ranging from as low as 10 cents to as high as 45 cents, depending on the network, the merchant, and the size of the transaction. Consequently, the merchant's total charge for each PIN debit transaction is the interchange fee plus the switch fee.

**Response:  First Data admits that PIN debit networks charge merchant processors "switch" fees and "interchange" fees. Interchange fees are transfer payments from merchant processors to issuers, which vary per transaction. First Data denies the remaining allegations contained in Paragraph 19.**

20.     At some networks, such as NYCE and Interlink, an advisory board representing the network's bank members has substantial authority over setting the network's interchange rates and determining the network's rules, including rules concerning the routing of PIN debit transactions.

**Response:  First Data admits that NYCE has an Advisory Group comprised of issuers and merchants, which comes together twice a year to discuss developments in the**

Case 3:03-mc-00143-GCM   Document 2   Filed 11/21/03   Page 96 of 113

payments industry and developments at NYCE. The NYCE Advisory Group has no authority over interchange fees or operating rules. First Data further admits that NYCE has a Network Oversight Board consisting of financial institution participants of the NYCE network, which has the right to veto proposed changes to NYCE's interchange fees and operating rules. First Data is without sufficient knowledge to admit or deny the remaining allegations contained in Paragraph 20 and, accordingly denies them.

21.     The PIN debit network services market is characterized by significant network effects. Financial institutions are more likely to join networks that are accepted by many merchants. Conversely, merchants are more likely to accept networks that have many large financial institutions as members because the value of a particular PIN debit network depends in great measure on the breadth of its acceptance and use.

Response: First Data admits that financial institutions consider various factors in joining PIN debit networks, including to some degree the extent of merchant acceptance. First Data denies the remaining allegations contained in Paragraph 21.

22.     Many debit cards can also execute "signature" debit transactions, in addition to PIN debit transactions. Signature debit transactions are authenticated like credit card transactions, with the customer signing for identification rather than entering a PIN. Visa and MasterCard developed the only two signature debit networks from their existing credit card infrastructure. In contrast to a PIN debit transaction, in which the funds are immediately transferred from the customer's account, a signature debit transaction generally takes twenty-four to forty-eight hours to settle.

Response: First Data admits that the vast majority of debit cards can also execute "signature" debit transactions, in addition to PIN debit transactions. First Data is

informed and believes that most, but not all, signature debit transactions are currently authenticated by the customer signing for identification rather than entering a PIN. First Data admits that Visa and MasterCard both have signature debit networks, that Visa and MasterCard developed their signature debit networks from their existing credit card infrastructure, and that they have leveraged their credit card dominance to force acceptance of their debit cards at merchant locations. First Data denies the remaining allegations contained in Paragraph 22.

23. PIN debit networks offer a number of substantial advantages to consumers and merchants that distinguish them from signature debit networks. PIN debit networks are generally considerably less expensive to merchants than signature debit networks, due to significantly lower interchange rates. PIN debit networks also provide a more secure method of payment than signature debit because it is much easier to forge a person's signature than to obtain an individual's PIN; consequently, fraud rates for PIN debit are substantially lower than for signature debit. Because of the increased security of PIN debit, there is no need for the complicated and expensive charge-back procedures that allow consumers to challenge signature debit transactions, thereby saving merchants additional time and money. PIN debit transactions also settle instantaneously, guaranteeing the merchant ready access to its receipts, whereas signature debit transactions usually take a day or two to settle. Finally, PIN debit networks allow for faster execution than signature debit networks. With a PIN debit transaction, customers can enter their PIN as soon as the first product is scanned. By contrast, customers cannot sign for signature debit transactions until after the entire order is totaled, prolonging the checkout process.

Response: First Data admits that there are currently some minor differences

Case 3:03-mc-00143-GCM   Document 2   Filed 11/21/03   Page 98 of 113

between PIN debit networks and signature debit networks, which have diminished and are continuing to diminish, and that PIN debit interchange is lower than signature debit interchange for some merchants and some transactions and higher for others. First Data otherwise denies the allegations contained in Paragraph 23.

24.     PIN debit networks also allow individuals to receive cash back at the register when making a purchase, a popular feature with many consumers. Customers cannot receive cash back when making a signature debit purchase. Today, customers request cash back in approximately 20 percent of all PIN debit transactions. Customers also value the additional security provided by PIN verification as opposed to signature.

**Response:  First Data admits that PIN debit networks may facilitate the receipt of cash back at the register when making a purchase. First Data is without sufficient knowledge or information to admit or deny the remaining allegations contained in Paragraph 24, and accordingly denies them.**

B.     *Relevant Product Market*

25.     The relevant product market affected by this transaction is the provision of PIN debit network services. A hypothetical monopolist could profitably impose a small but significant and nontransitory increase in the price of all PIN debit network services.

**Response:  First Data denies the allegations contained in Paragraph 25, which are contrary to the position taken by thousands of merchants in the Wal*Mart class action litigation against Visa and MasterCard.**

26.     Signature debit networks are not in the same product market as PIN debit networks because signature debit networks are substantially more expensive and have inferior functionality and features. PIN debit networks would remain substantially less expensive than

signature debit or credit card networks even after a small but significant nontransitory increase in price. Merchants would continue to purchase and promote the use of PIN debit network services because of the low fraud rate, corresponding lack of charge-backs, speed of execution at the register, and the cash back feature that many customers demand. As the President of First Data Merchant Services testified, PIN debit "is still the lowest-cost, most efficient, most secure transaction there is out there in electronic transactions."

> **Response: First Data admits that the President of First Data Merchant Services testified pursuant to CID. That testimony was transcribed, and the transcript speaks for itself. First Data denies the remaining allegations contained in Paragraph 26.**

27.     Merchants would not defeat a small but significant and nontransitory increase in the price of PIN debit network services by requiring or encouraging their customers to switch from PIN debit to signature debit or other payment methods.

> **Response: First Data denies the allegations contained in Paragraph 27.**

28.     The provision of PIN debit network services is a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18.

> **Response: First Data denies the allegations contained in Paragraph 28.**

C.     *Relevant Geographic Market*

29.     First Data and Concord compete with each other throughout the United States. Merchants in the United States could not switch to providers of PIN debit network services located outside of the United States in the event of a small but significant nontransitory increase in the price by PIN debit networks in the United States. While certain networks are stronger in particular areas of the country, the largest networks essentially operate on a national scale. Accordingly, the United States is a relevant geographic market within the meaning of

Section 7 of the Clayton Act, 15 U.S.C. § 18.

**Response: First Data admits that STAR and NYCE compete. First Data admits that merchants typically accept numerous PIN debit networks regardless of the physical location of the network switch, that POS debit networks operate nationally and that the relevant market is a national market in which regional networks can and do compete. First Data otherwise denies the allegations contained in Paragraph 29.**

## IV. MARKET CONCENTRATION

30.     The relevant market is highly concentrated and would become significantly more concentrated as a result of the proposed transaction. As of March 2003, the most recent period for which data is available, Concord accounted for approximately 56 percent of PIN debit transactions, while First Data had approximately a 10 percent share. The top four networks – STAR, Visa's Interlink, NYCE, and Pulse – routed over 90 percent of all PIN debit transactions. Using a standard measure of market concentration called the "HHI" (defined and explained in Appendix A), the market is highly concentrated, with a pre-merger HHI of approximately 3590. First Data's acquisition of Concord would increase the HHI by approximately 1120, resulting in a post-merger HHI of approximately 4710. While STAR has recently lost some significant bank contracts to Interlink and NYCE, under even the most conservative estimate of future market shares the combined firm would have approximately a 45 percent post-merger share. Taking into account these lost contracts, the PIN debit network services market remains highly concentrated and would become substantially more concentrated as a result of the merger, with a post-merger MR greater than 3000.

**Response: First Data denies the first sentence of Paragraph 30. First Data specifically denies that STAR has lost any significant POS PIN debit bank contracts to**

SF:21531017.3/2023550-0000300737

**NYCE. First Data admits that STAR has recently lost a number of significant bank contracts. First Data admits that NYCE currently switches approximately 10% of POS PIN debit transactions but denies that First Data has any share of POS PIN debit network transactions or that that constitutes a relevant market. First Data is without sufficient knowledge or information to admit or deny the remaining allegations contained in Paragraph 30 and, accordingly denies them.**

## V. ANTICOMPETITIVE EFFECTS

A.   *The Proposed Transaction Will Likely Substantially Reduce Competition Among PIN Debit Networks*

31.    First Data's acquisition of Concord will combine the largest and third-largest PIN debit networks and enable the resulting network to raise prices and to reduce levels of service to merchants.

**Response:  First Data denies the allegations contained in Paragraph 31.**

32.    PIN debit networks compete for merchant business by attempting to convince merchants to accept their networks and to route to their networks when there is a choice of routing options.  PIN debit networks also compete for merchants by improving their networks' transmission speed, limiting network down-time, and reducing the number of improperly rejected transactions.  Merchants' ability to choose which networks to accept at their stores and their control over the routing of some transactions acts as a constraint on the price of PIN debit network services to merchants.

**Response:  First Data admits that in some instances PIN debit networks compete for merchant acceptance and routing of transactions, and that merchants may in some circumstances elect not to accept certain PIN debit networks.  First Data denies the**

Case 3:03-mc-00143-GCM   Document 2   Filed 11/21/03   Page 102 of 113

**remaining allegations contained in Paragraph 32.**

33.    While most large merchants generally accept all of the PIN debit networks, retailers can and have used the threat of dropping a network to obtain lower prices. For example, in 2001 Visa announced a substantial rate increase for its PIN debit network, Interlink; STAR, and later NYCE, followed by announcing comparable price increases. A number of large retailers responded by stating that if Interlink implemented the planned price increase, they would no longer accept Interlink. In response, Interlink delayed and substantially scaled back its proposed price increase. Then STAR delayed and reduced its planned price increase to remain competitive. Similarly, NYCE concluded in an internal document that its "previously announced pricing [was] now out of balance with new market realities" and followed suit.

**Response: First Data admits that many large merchants accept more than one PIN debit network. First Data admits that the last sentence purports to quote part of a NYCE internal document. First Data is without sufficient knowledge to admit or deny the remaining allegations contained in Paragraph 33, and accordingly denies them.**

34.    Combining STAR and NYCE will make it substantially more difficult for merchants to use the possibility of dropping a network to prevent price increases. The larger the network, the more risky it is for a merchant to drop that network because of the increased likelihood of rejected transactions, delays at check-out lines, customer confusion and backlash, lost sales, and customer use of other forms of payment that are more costly to the merchant.

**Response: First Data denies the allegations contained in Paragraph 34.**

35.    The PIN debit networks take into account the merchants' competitive reactions when they make decisions about pricing. Earlier this year, NYCE was considering

Case 3:03-mc-00143-GCM    Document 2    Filed 11/21/03    Page 103 of 113

raising interchange rates to attract financial institutions to the network. NYCE's internal analysis of the market recognized, however, that "[t]aking a leadership role in POS interchange does not come without risk to the transaction growth engine of the NYCE Network and its current revenue stream . . . . *[P]recedent has been set via major retailers in the past dropping or threatening to drop a payment card network due to pricing. . . . [T]he risks are material that certain retailers or segments may decide to 'send a message' and simply stop taking NYCE-branded cards for purchases.*" (emphasis added)

**Response: First Data admits that in some circumstances PIN debit networks may take into account merchant reactions when they make decisions about pricing. First Data admits that Paragraph 35 purports to quote part of a NYCE document. First Data denies the remaining allegations contained in Paragraph 35.**

36. First Data's acquisition of Concord will also reduce competition in the PIN debit market by limiting merchants' ability to route transactions to the least-cost network. Major supermarkets and mass merchandisers have obtained superior prices and levels of service by routing, or threatening to route, transactions away from NYCE to STAR and vice versa. After the merger, merchants will no longer be able to seek lower prices and improved service from the combined firm by playing off NYCE and STAR against each other in this manner.

**Response: First Data denies the allegations contained in Paragraph 36.**

37. An internal merger planning document acknowledged the likely effect of First Data's acquisition of Concord on pricing in the PIN debit network services market: the "[c]ombination of NYCE and Star allows FDC [First Data Corp.] more leeway to set market pricing."

**Response: First Data admits that Paragraph 37 purports to quote part of an**

SF:21531017.3/2023550-0000300737

**internal document. That quote is taken out of context from a draft document. When the entire draft document is read, it is clear that some First Data employees were considering ways to lower the prices merchants pay given the expected efficiencies from the merger of STAR and NYCE. First Data denies the remaining allegations contained in Paragraph 37 and specifically denies that the quoted document is a merger planning document.**

      38.    Interchange fees have risen dramatically in the past several years as the PIN debit network services market has become more highly concentrated. First Data's acquisition of Concord will likely exacerbate this trend toward higher pricing by further reducing competition in the market. Merchants will be forced to pass on a significant portion of the higher fees to tens of millions of consumers, in the form of higher prices for all goods and services. Merchants do not typically pass through increase costs for particular forms of payment on a per-transaction basis.

      **Response: First Data admits that interchange fees have increased in the past several years, but specifically denies it is the result of increased concentration in network services. First Data denies the remaining allegations contained in Paragraph 38.**

      39.    Any efforts the combined First Data/Concord might make to expand PIN debit usage after the merger would not prevent the company from raising prices to merchants that already accept PIN debit. PIN debit networks are able to charge different prices to merchants based on the value of the network to the particular company or type of merchant. For example, First Data and Concord have both recently offered substantial discounts to quick-service restaurants to encourage them deploy PIN pads at all of their locations. At the same time, First Data and Concord have dramatically raised their merchant fees to the market as a whole. This ability to engage in price discrimination will facilitate First Data's exercise of

SF:21531017.3/2023550-0000300737

market power post-merger by allowing it to simultaneously raise prices to merchants that already

accept PIN pads and cut special deals to attract new market segments to the network.

**Response: First Data admits that if the merger is consummated the combined firm intends to make efforts to expand PIN debit usage to the benefit of consumers. First Data admits that some PIN debit networks set different interchange fees for different types of merchants. First Data denies the remaining allegations contained in Paragraph 39.**

B.    *Lack of Countervailing Factors*

40.    It is unlikely that entry or expansion in the PIN debit network services

market will occur in a timely manner or on a scale sufficient to undo the competitive harm that

the merger will produce. Entry and expansion are difficult because they require large, sunk

investments to attract bank members, and, to a lesser degree, participating merchants.

Coordinated development of both bank members and merchant acceptance is critical because the

utility of a particular PIN debit network to customers, banks, and merchants depends not only on

the cost and features of the card, but also on the breadth of its acceptance and use. These

network effects that characterize the PIN debit network services market make it difficult for

small networks to significantly expand their market share.

**Response: First Data denies the allegations contained in Paragraph 40.**

41.    Banks would have little incentive to join a new or small network that was

attempting to expand market share by offering lower interchange rates to merchants. To the

contrary, a bank would only have an incentive to join a network if it offered higher interchange

rates. Without such bank participation, a network's attempts to expand would prove fruitless.

Moreover, financial institutions benefit from a market structure characterized by a limited

DEFENDANT FIRST DATA CORPORATION'S ANSWER AND AFFIRMATIVE DEFENSES

21

number of significant PIN debit networks and face fewer competitive constraints to setting higher prices to merchants.

**Response: First Data admits that issuers prefer higher interchange fees, all else equal. First Data denies the remaining allegations contained in Paragraph 41.**

42. The PIN debit networks have adopted rules and policies that further increase the cost for a network to expand by developing bank and merchant participation. For example, the networks' priority routing rules make entry more difficult and less likely. Even if a network succeeds in convincing banks to add its bug to the banks' debit cards, the network is unlikely to see many transactions because of the priority routing rules. In addition, STAR requires its member banks to use STAR for both ATM and PIN debit network services; this all-or-nothing requirement makes it more difficult for competing networks to convince banks to participate in their network. Finally, banks that want to act as acquirers for STAR ATM and PIN debit transactions must issue cards that participate in the STAR network. Because a significant number of banks have substantial ATM or merchant acquiring businesses, the STAR rule further inhibits potential expansion by competing PIN debit networks. After the merger, the application of any or all of these rules to First Data/Concord's combined network would inhibit entry or expansion by other PIN debit networks.

**Response: First Data admits that PIN debit networks may have rules and policies that govern routing, including priority routing rules. First Data is without sufficient knowledge or information to admit or deny the allegations contained in fourth and fifth sentences of Paragraph 42 and, accordingly denies them. First Data denies the remaining allegations contained in Paragraph 42.**

43. Finally, the combination of First Data's and Concord's merchant

Case 3:03-mc-00143-GCM   Document 2   Filed 11/21/03   Page 107 of 113

processing businesses with their PIN debit networks will raise barriers to entry. The combined

First Data/Concord will process more than half of all PIN debit transactions. As the merchant

processor, the merged firm will have significant control over which network routes a transaction

on a double-bugged card. As the owner of the dominant PIN debit network, First Data will have

a significant incentive to exercise this control after it acquires Concord, inhibiting other PIN

debit networks from expanding their presence in the market.

**Response: First Data denies the allegations contained in Paragraph 43.**

## VI. VIOLATION ALLEGED

44.     The United States and the Plaintiff States hereby incorporate paragraphs 1

through 43.

**Response: In response to the incorporation of paragraphs 1 through 43,**
**First Data restates its responses to each and every one of those paragraphs.**

45.     First Data's acquisition of Concord would likely substantially lessen

competition in the provision of PIN debit network services, in violation of Section 7 of the

Clayton Act, 15 U.S.C. § 18. The transaction would likely have the following effects, among

others:

(a)     competition between First Data and Concord in the provision of

PIN debit network services would be eliminated;

(b)     competition generally in the provision of PIN debit network

services would be eliminated or substantially lessened;

(c)     prices of PIN debit network services to merchants that currently

use them would likely increase to levels above those that would prevail absent the

merger, forcing merchants to pass on these increased costs in the form of higher prices

DEFENDANT FIRST DATA CORPORATION'S ANSWER AND AFFIRMATIVE DEFENSES

23

for all goods and services to tens of millions of consumers; and

   (d) quality in the provision of PIN debit network services would likely decrease to levels below those that would prevail absent the merger.

  **Response:  First Data denies the allegations contained in Paragraph 45 and all subparts.**

**REQUEST FOR RELIEF**

  46. The United States and the Plaintiff States request:

   (a) that the proposed acquisition be adjudged to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

   (b) that the Defendants be permanently enjoined and restrained from carrying out the Agreement and Plan of Merger dated April 1, 2003, or from entering into or carrying out any agreement, understanding, or plan by which First Data would merge with or acquire Concord, its capital stock, or any of its assets;

   (c) that the United States and the Plaintiff States be awarded costs of this action;

   (d) that as the Court may deem appropriate, the Plaintiff States be awarded reasonable attorneys' fees and costs permitted by law; and

   (e) that the United States and the Plaintiff States have such other relief as the Court may deem just and proper.

  **Response:  First Data denies the allegations contained in Paragraph 46 and all subparts, and denies that Plaintiffs are entitled to any relief.**

**AFFIRMATIVE DEFENSE**

  First Data asserts the following affirmative defense without assuming the burden

of proof that would otherwise rest with Plaintiffs:

The efficiencies that will result from First Data's acquisition of Concord would result in significant economies that would benefit competition and consumers.

Dated: October 31, 2003

Respectfully submitted,

_____/s/_____

Geraldine M. Alexis (*pro hac vice*)
Christopher B. Hockett (*pro hac vice*)
Frank M. Hinman (*pro hac vice*)
**BINGHAM MCCUTCHEN, LLP**
Three Embarcadero Center
San Francisco, CA 94111
Telephone: 415.393.2000

Gerard Finn, DC Bar No. 448462
**BINGHAM MCCUTCHEN LLP**
1120 20th Street NW, Suite 800
Washington, D.C. 20036
Telephone: 202.778.6155

John H. Culver
704/331-7453
Facsimile 704/353-3153
Jculver@kennedycovington.com

November 20, 2003

VIA FACSIMILE

Victoria L. Lippincott
Collier Shannon Scott PLLC
3050 K Street NW, Ste. 400
Washington, DC

RE:   US v. First Data Corp et al.
      Case No. 1:03cv2169



**EXHIBIT**

E

Dear Ms. Lippincott:

Pursuant to Fed. R. Civ. P. 45(c)(2)(B), I hereby serve you with notice that Bank of America Corporation ("Bank of America") objects to the subpoena *duces tecum* issued by the United States District Court for the Western District of North Carolina  (the "Court") on November 10, 2003, that you purportedly served on Bank of America's agent for service of process on November 11, 2003 via process server, and the production of the documents described in the exhibit attached to subpoena. Without limiting the reasons for that objection in the event that this matter must be submitted to the court, service of the subpoena is deficient because no witness fee was tendered with the subpoena, because it does not allow for a reasonable time for compliance and is otherwise procedurally deficient.

While this letter serves as Bank of America's formal written objection to the Subpoena under Rule 45(c)(2)(B), as discussed below, Bank of America plans to continue its efforts and negotiations in an attempt to reach a mutually agreeable compromise.  Those discussions are not intended to waive, and you must agree that your client will not assert that the discussions waive, any assertion by Bank of America that the service of the subpoena was deficient or any other objections that Bank of America may have to producing the requested documents. If your client is unwilling to agree to that condition, then Bank of America will cease negotiations and seek protection from the Court.

As an additional ground for objecting to the production of the documents sought, Bank of America asserts that the requested documents contain extremely confidential trade information of Bank of America. Many of the documents sought in the subpoena contain highly

KENNEDY COVINGTON LOBDELL & HICKMAN, L.L.P.        www.kennedycovington.com     HEARST TOWER,  2196023.01  F L O O R
CHARLOTTE  RALEIGH  RESEARCH TRIANGLE PARK  ROCK HILL    telephone 704.331.7400     214   NORTH  TRYON STREET
                                                         facsimile 704.331.7598     CHARLOTTE, NORTH CAROLINA 28202

confidential trade secrets and competitive strategies of Bank of America for the debit card market, the disclosure of which would injure Bank of America. Many of the documents that are sought are in no way relevant or likely to lead to the discovery of information that is relevant to the pending action. Furthermore, the disclosure of the business information in those documents to your clients will severely prejudice Bank of America because the documents contain highly sensitive commercial information that could be used to the competitive disadvantage of Bank of America. The proposed confidentiality order is inadequate to protect Bank of America.

Bank of America has been in touch with Hitesh Barot, a lawyer with the Bingham McCutchen firm in San Francisco in an attempt to narrow the scope of the requests and to agree upon a reasonable timetable for production. Those discussions to date have not resulted in a narrowing of the issues in dispute or adequate protection for Bank of America. Bank of America is willing to continue those discussions and hopefully those discussions will narrow or perhaps eliminate any disputes about the production. As those discussions proceed, however, Bank of America preserves all of its rights to object to the form and substance of the subpoena, both on procedural grounds and on the substance of the requests.

The objections set forth in this letter are not intended to be exclusive, as due to the scope and breadth of the subpoena, we have not had an opportunity to gather all of the documents that may be responsive to the subpoena. For that and other reasons, Bank of America reserves the right to raise additional objections as this process moves forward. Bank of America is prepared to begin production of those documents which it has located in the format in which those documents are regularly maintained and under the highest protections afforded by the proposed confidentiality order. That limited production is not a waiver of any objection to the subpoena. If that is not agreeable, then Bank of America will withhold production of any documents until the issues regarding production are completely resolved.

Finally, Bank of America requests, consistent with Rule 45(c)(1) of the Federal Rules of Civil Procedure, that your clients pay the reasonable expenses, including attorneys' fees, Bank of America incurs to search and produce responsive documents in compliance with the Subpoena.

Please contact me if you have any questions about this letter.

Sincerely,

John H. Culver
For the Firm

JHC/

2196023.01
LIB: CH

| COM No. | REMOTE STATION | START TIME | DURATION | PAGES | RESULT | USER ID | REMARKS |
|---------|---------------|-----------|----------|-------|--------|---------|---------|
| 625 | (202) 342-8451 | 11-20 15:57 | 02'44 | 03/03 | OK | | |

31232593

# *Kennedy Covington*

## ATTORNEYS AT LAW

FACSIMILE TRANSMISSION SHEET                    November 20, 2003

PLEASE DELIVER THE FOLLOWING PAGES TO:

NAME:        Victoria L. Lippincott              COMPANY:      Collier Shannon Scott PLLC
FAX NUMBER:  (202) 342-8451                      TELEPHONE:    (202) 342-8885

FROM:   John H. Culver III                       DIRECT DIAL:  704.331.7453
                                                 DIRECT FAX:   704.353.3153

TOTAL PAGES (INCLUDING COVER):   3

COMMENTS OR SPECIAL INSTRUCTIONS

*IF YOU DO NOT RECEIVE THE TOTAL NUMBER OF PAGES INDICATED ON THIS TRANSMISSION SHEET, PLEASE CALL US AT 704.331.7453.*